PEOPLE v McDADE

Docket No. 307597. Submitted June 4, 2013, at Grand Rapids. Decided
    June 18, 2013, at 9:00 a.m.

Dallas A. McDade, Jr., was convicted by a jury in the Kalamazoo
    Circuit Court, Alexander C. Lipsey, J., of first-degree murder, three
    counts of possession of a firearm during the commission of a felony,
    two counts of assault with intent to commit murder, and carrying
    a concealed weapon. He was sentenced to life imprisonment
    without the possibility of parole for the first-degree murder
    conviction, life imprisonment for each of the two assault convic-
    tions, 2½ to 5 years in prison for the concealed weapon conviction,
    and 2-year prison terms for the felony-firearm convictions. Defen-
    dant appealed.

The Court of Appeals *held*:

1. The evidence was sufficient to establish a foundation under
    MRE 901 to admit in evidence three notes that were written in the
    jail and passed between Marlen Stafford, an alleged witness to
    defendant's crimes, and another inmate, Shondell Kellumn. A
    guard testified that he passed the notes between Stafford and
    Kellumn and a police detective testified that Kellumn had indi-
    cated to him that he had passed the notes to and from defendant
    and that defendant actually wrote the second note. Both Stafford
    and Kellumn refused to testify at trial. The requirement of
    authentication or identification as a condition precedent to admis-
    sibility was satisfied by evidence sufficient to support a finding
    that the matter in question was what its proponent claimed. MRE
    901(a).

2. The two notes written by Stafford were admissible because
    they were not offered into evidence to prove the truth of the
    matter asserted. If they constituted hearsay, they were admissible
    under the hearsay exception for statement's concerning a
    declarant's then existing state of mind, MRE 803(3), shedding
    light on Stafford's intent, plan, and design relative to testifying.
    The third note was admissible as an admission by a party oppo-
    nent, MRE 801(d)(2), given the evidence that defendant actually

wrote the note. In addition, the note was not offered to prove the truth of the matter asserted. MRE 801(c). There was no hearsay violation.

3. The note that was passed to Stafford reflected an effort specifically designed to prevent Stafford from testifying; there was an intent to make Stafford unavailable as a witness. No violation of defendant's right to confrontation occurred as a result of the admission of the notes or a recording of Stafford's interviews with the police. If error occurred in this regard, it was harmless.

4. Defendant failed to show the necessary nexus between the facts of this case and the alleged need for a handwriting expert. The trial court did not err by denying defendant's request for appointment of the expert.

5. The composition of the photographic lineup presented to various witnesses was not impermissibly suggestive to the extent that it would have given rise to a substantial likelihood of misidentification. None of the circumstances surrounding the identifications made the identifications suggestive or otherwise improper. In addition, there existed an independent basis for the witnesses to identify defendant in court since the witnesses had experienced a long period in which to observe defendant during the criminal episode and periods of their interaction.

6. Defendant, who was 17 when the homicide was committed, had been sentenced, had filed a claim of appeal, and had submitted an appellate brief before *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *People v Carp*, 298 Mich App 472 (2012), were decided. The holding in *Miller* is therefore applicable in this case under the holding in *Carp*. Pursuant to *Carp*, when sentencing an individual below 18 years of age for a homicide offense, the sentencing court must, at the time of sentencing, evaluate and review those characteristics of youth and the circumstances of the offense as delineated in *Miller* and *Carp* in determining whether, following the imposition of a life sentence, the juvenile is to be deemed eligible or not eligible for parole. Defendant's sentence for the first-degree murder conviction is vacated and the matter is remanded for resentencing consistent with *Miller* and *Carp*.

Convictions affirmed, sentences affirmed in part and vacated in part, and remanded for resentencing.

1. CRIMINAL LAW — EVIDENCE — EXPERT WITNESSES — INDIGENT DEFENDANTS.

A trial court's decisions whether a handwritten note has been properly authenticated for admission into evidence or to grant an

indigent defendant's motion for the appointment of an expert witness are reviewed for an abuse of discretion.

2. EVIDENCE — DETERMINING ADMISSIBILITY.

A trial court, in determining whether the evidence proffered for admission at trial is admissible, may consider any unprivileged evidence regardless of that evidence's admissibility at trial.

3. EVIDENCE — HEARSAY — UNAVAILABILITY OF DECLARANT CAUSED BY PARTY.

A court may, if a declarant is unavailable, admit a statement of the declarant offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness; a defendant forfeits his or her constitutional right of confrontation if a witness's absence results from wrongdoing procured by the defendant; the forfeiture rule applies only when the defendant, or an intermediary, engaged in conduct specifically designed to prevent a witness from testifying and there must be an intent to make the witness unavailable (MRE 804[b][6]).

4. EVIDENCE — PHOTOGRAPHIC LINEUPS — SUGGESTIVENESS.

A photographic identification procedure or lineup violates due process guarantees when it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.

5. HOMICIDE — SENTENCES — PERSONS UNDER EIGHTEEN — PAROLE.

A sentencing court must consider characteristics associated with youth and the circumstances of the offense, as identified in *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407(2012), when determining whether to sentence a person who was under the age of 18 at the time of their homicide offense to life in prison with or without the eligibility for parole.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Jeffrey R. Fink*, Prosecuting Attorney, and *Cheri L. Bruinsma*, Assistant Prosecuting Attorney, for the people.

*Donald L. Sappanos* for defendant.

Before: MURPHY, C.J., and FITZGERALD and HOEKSTRA, JJ.

MURPHY, C.J. Defendant appeals as of right his convictions by a jury of first-degree murder, MCL 750.316, three counts of possession of a firearm during the commission of a felony, MCL 750.227b, two counts of assault with intent to commit murder, MCL 750.83, and carrying a concealed weapon, MCL 750.227. Defendant was sentenced to mandatory life imprisonment absent the possibility of parole for the first-degree murder conviction, life imprisonment for each of the two assault convictions, $2^1/_2$ to 5 years' imprisonment for the concealed weapon conviction, and 2-year prison terms for the felony-firearm convictions. We affirm defendant's convictions and all his sentences, except for the mandatory life sentence for the murder conviction. Pursuant to *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *People v Carp*, 298 Mich App 472; 828 NW2d 685 (2012), and given that defendant was 17 years old at the time of the murder, we vacate the murder sentence and remand for resentencing consistent with the directives in *Miller* and *Carp*.

On July 14, 2010, James Warren went to a store in Kalamazoo where he spoke to defendant about acquiring some marijuana for resale in a profit-sharing arrangement. There was no drug transaction at the store, and instead defendant and Warren proceeded by bicycle to a home on Washington Avenue. Warren knew Lenell Ewell, who was often at the house. Ewell was friends with Carlton Freeman, and Freeman resided in one of the units in the subdivided house. Freeman, Ewell, and a mutual friend, Erick Jenkins, were at the home when defendant and Warren arrived at about 5:30 p.m. According to Warren, defendant gave him some marijuana to sell and a small amount of cash to make change when Warren sold the marijuana, and Warren rode away on defendant's bicycle, while defendant remained at the

house to await Warren's return.[1] Ewell had indicated that defendant could remain at the location while awaiting Warren's return, which ultimately never did transpire.

Freeman, Jenkins, Ewell, and defendant went into the backyard of the Washington Avenue home after Warren left the premises. Ewell and Jenkins were drinking beer, Freeman was not. Time passed absent Warren's return, and defendant eventually spoke to someone on his cellular telephone. Defendant appeared to become frustrated and started making accusatory statements concerning the other three men. They, however, expressed befuddlement and denied involvement in a scam against defendant. Freeman testified that defendant rejected their denials and remained angry at them. Defendant subsequently walked around to the front of the house where another individual, Marlen Stafford, was waiting. Freeman, Jenkins, and Ewell followed defendant around the house and stepped onto the home's porch, while defendant continued walking to the sidewalk where Stafford was standing. At some point, defendant told the group on the porch that "[h]e wasn't leaving till he got his stuff back." According to Freeman, defendant then took out a revolver and stated that "[s]omebody . . . was gonna die[.]" Freeman and Jenkins ran into the backyard and defendant began shooting. Freeman escaped, Jenkins did not. Ewell remained on the porch. He testified that he did not even realize that he had been shot until he heard someone say, "You got shot—."

---

[1] Ewell testified, however, that defendant gave Warren some money to go purchase marijuana for defendant. Freeman testified that he did not know why defendant waited at the house after Warren's departure. With respect to Warren's version of the events, it is unclear where defendant obtained the marijuana that he purportedly gave to Warren for resale.

Officer Brian Cake was the first officer to respond to the shooting at the home. Cake asked Ewell if the bullet came from a vehicle, and Ewell responded affirmatively. Jenkins was found in the backyard with a single bullet wound to the back. He was pronounced dead shortly thereafter. Officer Joshua Breese spoke with Ewell for about 10 minutes at the hospital on the day of the shooting, and the officer thereafter indicated that Ewell gave him multiple stories about what had happened that day. Detective Harold West also went to see Ewell at the hospital, and the detective described him as being very irritable, still intoxicated, oscillating in emotional intensity, and repeatedly asserting that he did not want treatment and wished to leave. Later in the evening, West showed Ewell a photographic lineup, which included an individual named James Turner, but not defendant. Ewell did not take much time studying the photographs, pointed to Turner's image, and said that he was the shooter.

At some point in the evening of July 14, 2010, Officer Fidel Mireles transported Freeman to the police station to be interviewed. Mireles indicated that Freeman told him that "James" was one of the shooters. Detective Kristin Cole interviewed Freeman later that night and understood Freeman to have meant that "James," meaning James Warren, was merely involved with the shooting. Detective West again met and spoke with Ewell on July 16, 2010. As West entered the room, Ewell, without prompting, blurted out that he, in the prior interview, had mistakenly identified the wrong person. West showed Ewell a different photographic lineup, which included defendant. West observed Ewell "go over all the photographs, looking at each one . . . very, very carefully." Ewell then placed his hand on defendant's photograph and stated, "I got a funny feeling. I don't know why I'm getting this strange

feeling," followed by, "[t]his him. This the guy right there." Afterward, West told Ewell, "good job," but the detective claimed that his remark was merely an interpersonal nicety, not an affirmation of Ewell's identification of defendant. At trial, Ewell again identified defendant as the shooter and claimed that his initial misidentification of Turner was due to fear of reprisal.

On July 19, 2010, Detective Michael Hecht showed Freeman five photographic lineups, which separately included photographs of defendant, Warren, Turner, and Stafford. Freeman identified Warren as the person who originally accompanied defendant to the house, and he identified Stafford as the person who later came to the house and stood next to defendant. Freeman eventually selected defendant as the shooter. Before identifying defendant, Freeman had asked to see additional photographs. With respect to defendant's photograph, Freeman stated, "I want to say it's him" or "[i]t got to be him," among other things. He did not select James Turner. Hecht interviewed Stafford on July 20, 2010, which was Stafford's second interview, and Stafford eventually admitted that he had observed the shooting, identifying defendant as the shooter.

On July 24, 2010, Warren was interviewed by Detective Robert East and was presented a photographic lineup. Warren was not asked to first provide a description of the shooter before reviewing the lineup. Warren told the interviewing detective that he wished to look at a second page of photographs, but there were no other pages available. Detective East admitted that Warren repeated the word "tall" while looking at the lineup, and East acknowledged that because of the composition of the different photographs, defendant's head appeared closer to the top of the picture frame than did the heads of the other persons shown, despite the fact

that defendant was the shortest person in the lineup grouping. At trial, Warren again identified defendant.

Defendant agreed to be interviewed by Detective Hecht on July 27, 2010. He denied involvement with the shooting and claimed to have been at a family barbecue or with a woman. Defendant also provided the police several cellular telephone numbers that he claimed to have used recently. The police, with the assistance of FBI agent Mark Waldvogel, determined that the associated cellular telephone records indicated that one or more of the cellular telephone numbers provided by defendant reflected contacts or communications near Washington Avenue around the time of the shooting.

On October 1, 2010, Detective William Moorian organized a live, corporeal lineup featuring defendant. Warren attended the lineup while drunk and "recognized" a person in the lineup who was not defendant. Ewell and Freeman each viewed the lineup and identified defendant as the shooter.

On October 4, 2010, the day before the preliminary examination was conducted, Ewell contacted Detective Hecht and showed Hecht his cellular telephone, which displayed call logs, including at least one entry from a telephone number belonging to defendant's mother. Ewell had also received a call from a different phone number, with the caller warning Ewell that "[y]ou gonna get yours," and "[y]ou better watch your back."

As of August 8, 2010, an individual named Shondell Kellumn, along with defendant and Stafford, were all being held in the same jail. Defendant and Kellumn were held in the same cellblock, while Stafford was held in a different cellblock in the same wing of the jail. Stafford asked Deputy Bryan McLain to pass a handwritten note to Kellumn on August 8, which McLain photographed. This first note was addressed

to "Dalloc"[2] and stated, "They just came in[,] said if I come to your court day [and] say that you did it they will give me $60,000 to say you did it . . . ." Kellumn later asked McLain to pass a note to Stafford, which McLain also copied. This note read, in part:

> Marlen[:] even if you said something already[,] just don't say nothing when you go to Dallas court date. If you real like you say . . . . when you get on the stan[d,] just say you don't [know] this man and tell them you was just scared because Duck [Turner] said he was [going to] kill you or something . . . . Just play that role . . . .

McLain was then asked by Stafford to pass a final note to Kellumn, which was also photographed. This note provided, "I'm goin to court [and] say that," among other things.

Before trial, defendant requested appointment of an expert witness in handwriting analysis to determine whether one of the notes was written by defendant. The trial court denied the motion. At trial, the trial court admitted the three notes into evidence over defendant's objection, after which Kellumn and Stafford were called to the stand, refused to testify, and were then found "unavailable" for purposes of MRE 804 (hearsay exceptions for unavailable declarants). The prosecutor proceeded to move, under MRE 804(b)(6), for the admission of a videotaped recording of Stafford's police interviews, wherein Stafford acknowledged witnessing the shooting and identified defendant as the shooter. In a brief evidentiary hearing outside the presence of the jury, Detective Hecht testified that he spoke with Kellumn, who admitted passing the notes from Stafford to defendant and who further indicated that defendant actually wrote the note that was passed to Stafford.

---

[2] Defendant's first name is "Dallas."

Hecht also stated that the letters were written in "code" to make them sound as if they were written by another person. The trial court admitted Stafford's videotaped interviews, and defendant was ultimately found guilty on all counts.

On appeal, defendant first argues that the three jailhouse notes constituted inadmissible, unauthenticated hearsay, that the admission of Stafford's recorded interviews violated defendant's right of confrontation, and that the trial court erred by refusing to appoint a handwriting expert. We disagree. While a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion, a preliminary or underlying issue of law regarding the admissibility of the evidence, such as whether a rule of evidence bars admission, is reviewed de novo. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). It is an abuse of discretion to admit evidence that is inadmissible as a matter of law. *Id*. " 'The decision whether a letter has been properly authenticated for admission into evidence is a matter within the sound discretion of the trial court.' " *People v Ford*, 262 Mich App 443, 460; 687 NW2d 119 (2004) (citation omitted). Likewise, "[t]his Court reviews for abuse of discretion a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert witness." *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006), citing MCL 775.15.

We shall first address the authentication argument. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). An example of authentication or identification that conforms to the requirements of MRE 901(a) is "[t]estimony that a matter is what it is claimed to

be." MRE 901(b)(1). "It is axiomatic that proposed evidence need not tell the whole story of a case, nor need it be free of weakness or doubt. It need only meet the minimum requirements for admissibility." *People v Berkey*, 437 Mich 40, 52; 467 NW2d 6 (1991). Further, "a trial court may consider *any* evidence regardless of that evidence's admissibility at trial, as long as the evidence is not privileged, in determining whether the evidence proffered for admission at trial is admissible." *People v Barrett*, 480 Mich 125, 134; 747 NW2d 797 (2008). Here, Deputy McLain testified that he passed the notes at issue between Stafford and Kellumn, while Detective Hecht testified that Kellumn had indicated that he passed the notes to and from defendant and that defendant actually wrote the second note. This was sufficient to establish a foundation under MRE 901 for purposes of all three letters. *People v Roby*, 145 Mich App 138, 141; 377 NW2d 366 (1985).

We next address the hearsay argument in relationship to the three notes. Hearsay evidence is inadmissible unless it fits within an exception to the hearsay rule. MRE 802; *People v McLaughlin*, 258 Mich App 635, 651; 672 NW2d 860 (2003). The two notes from Stafford were admissible because they were not offered into evidence "to prove the truth of the matter[s] asserted," MRE 801(c), and, assuming the notes constituted hearsay, they would qualify under the exception for statements concerning a declarant's then existing state of mind, MRE 803(3), shedding light on Stafford's intent, plan, and design relative to testifying. In regard to the other note, given the evidence that defendant actually penned the note, it was admissible as an admission by a party opponent, MRE 801(d)(2), and, moreover, the note was not offered to prove the truth of the matter asserted, MRE 801(c). The hearsay argument is unavailing.

With respect to the Confrontation Clause argument and the playing of Stafford's recorded interviews, we begin by observing the connection between our rules of evidence and the Confrontation Clause analysis. "Controversies over the admission of hearsay statements may also implicate the Confrontation Clause, US Const, Am VI, which guarantees a criminal defendant the right to confront the witnesses against him or her." *People v Dendel (On Second Remand)*, 289 Mich App 445, 452-453; 797 NW2d 645 (2010). Under MRE 804(b)(6), if a declarant is unavailable, a court may admit a "statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." MRE 804(b)(6) is "a codification of the common-law equitable doctrine of forfeiture by wrongdoing," and "[u]nder the doctrine, a defendant forfeits his or her constitutional right of confrontation if a witness's absence results from wrongdoing procured by the defendant[.]" *People v Jones*, 270 Mich App 208, 212; 714 NW2d 362 (2006) (citations omitted). In *Giles v California*, 554 US 353; 128 S Ct 2678; 171 L Ed 2d 488 (2008), the United States Supreme Court directly addressed the theory of "forfeiture by wrongdoing" for purposes of the Confrontation Clause. The Court held that the forfeiture rule applies only when the defendant, or an intermediary, engaged in conduct specifically designed to prevent a witness from testifying; there must be an intent to make a witness unavailable. *Id.* at 359-361.

Here, the note that was passed to Stafford in jail did reflect an effort specifically designed to prevent Stafford from testifying; there was an intent to make him unavailable. The notes from Stafford arguably might suggest that Stafford, on his own volition, did not intend to testify regardless of the note from

Kellumn/defendant. Nevertheless, the note to Stafford was clearly intended or designed to keep Stafford off the witness stand, and one could reasonably infer that Stafford did not testify because of the note. Indeed, the note, in addition to the language already quoted, had language that could be construed as threatening, although indirectly or implicitly so, because it indicated a desire by the writer to beat to death James Turner, referred to as "Duck," followed immediately by a statement that Stafford should expect the prosecution to put him on the stand against defendant. In sum, we hold that the trial court did not err in its ruling under the Confrontation Clause. Additionally, given the multiple identifications of defendant as the perpetrator, along with the circumstantial evidence, any assumed error was harmless beyond a reasonable doubt. *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005) ("Harmless error analysis applies to claims concerning Confrontation Clause errors," but the record must be thoroughly examined "in order to evaluate whether it is clear, beyond a reasonable doubt, that the jury verdict would have been the same absent the error.").

We next address defendant's argument that an expert witness on handwriting should have been appointed, because it was contested whether defendant personally authored any of the notes, and since, without proof of direct authorship, the prosecution could not establish that defendant forfeited his confrontation right with respect to Stafford's police interviews. We disagree. In *Jones*, 270 Mich App at 220, the "[d]efendant [took] issue with the fact that the court relied on testimony from [an officer] concerning [a gang member's] threat and the alleged letter from defendant, rather than on direct testimony from [the intimidated witness] or his mother." However, this Court found that

under the circumstances of the case, the lack of direct evidence did not preclude a finding of the defendant's wrongdoing:

> To the extent that the court's finding rested on [the officer]'s credibility, it was a matter for the trial court to decide. . . . [T]he trial court could infer from the evidence before it that defendant had a role in intimidating or issuing the death threat to silence [the intimidated witness] . . . . [*Id.* at 220-221.]

Here, even if expert testimony in this case established that defendant did not put pen to paper, the trial court could still have reasonably found the testimony of Hecht and McLain sufficiently credible to infer that defendant had a role in encouraging Kellumn to write the note to Stafford. Defendant cannot show the necessary nexus between the facts of this case and the need for an expert. *People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995) (no error in denying appointment where expert testimony unlikely to benefit the defendant).

Next, defendant argues that the trial court improperly admitted evidence of various witnesses' identifications of defendant that were based on an unduly suggestive photographic lineup and that were communicated to the police under unduly suggestive circumstances. We disagree. A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous. *People v Barclay*, 208 Mich App 670, 675; 528 NW2d 842 (1995). Issues of law relevant to a motion to suppress are reviewed de novo. *People v Hickman*, 470 Mich 602, 605; 684 NW2d 267 (2004). Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made. *Barclay*, 208 Mich App at 675.

A photographic identification procedure or lineup violates due process guarantees when it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). In *People v Kurylczyk*, 443 Mich 289, 311-312; 505 NW2d 528 (1993), our Supreme Court stated:

> Like a photographic lineup, the suggestiveness of a corporeal lineup must be examined in light of the totality of the circumstances. As a general rule, "physical differences between a suspect and other lineup participants do not, in and of themselves, constitute impermissible suggestiveness . . . ." Differences among participants in a lineup
>
> "are significant only to the extent they are apparent to the witness and substantially distinguish defendant from the other participants in the line-up. . . . It is then that there exists a substantial likelihood that the differences among line-up participants, rather than recognition of defendant, was the basis of the witness' identification."
>
> Thus, in *People v Holmes*, 132 Mich App 730, 746; 349 NW2d 230 (1984), where the defendant was the second tallest participant in the lineup and heavier than others, the lineup was not impermissibly suggestive because the defendant's appearance was substantially similar to that of the other participants. In *People v Horton*, 98 Mich App 62, 67-68; 296 NW2d 184 (1980), the lineup was not impermissibly suggestive despite alleged age and height differences between the defendant and the other participants and despite the fact that the defendant was the only participant with a visibly scarred face. A lineup in which the defendant was the only participant with both a mustache and a goatee was found to be not impermissibly suggestive in *People v Hughes*, 24 Mich App 223; 180 NW2d 66 (1970). [Citations omitted; other omissions in original.]

In *People v Dean*, 103 Mich App 1, 10; 302 NW2d 317 (1981), this Court observed "that the mere fact that defendant's photograph was taken from a vertical angle

was [not] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

Here, defendant lists a number of differences between defendant and the other individuals included in the photographic array, which defendant claims merits suppression and reversal: the initial array had defendant's picture cropped so that the top of his head appeared closer to the top of the picture frame than did the heads of the other individuals, which was troublesome given that the shooter was described as "tall"; defendant's picture was placed between those of two young men with broader shoulders; three of the individuals had a somewhat darker skin tone; two individuals were wearing an earring; and only three of the individuals had more elongated heads. However, with the exception of the "height" argument, defendant fails to explain how these differences would result in a substantial likelihood of misidentification, as opposed to merely constituting "noticeable" differences. See *Holmes*, 132 Mich App at 746. If one were to accept defendant's complaints about the slight physical differences or variations, it would make it nearly impossible for the police to compose a lineup, forcing authorities to search for "twin-like" individuals to match against a defendant. With regard to the arguments concerning height and defendant's image being cropped too high, there was testimony that Warren, and only Warren, referred to the person from whom he had acquired the marijuana as being relatively "tall." We fail to see how this insignificant discrepancy would justify a conclusion that the photographic array was impermissibly suggestive. We hold that the composition of the photographic lineup was not impermissibly suggestive to the extent that it would have given rise to a substantial likelihood of misidentification. Further, in regard to defendant's

assertion that the circumstances surrounding the identifications were unduly suggestive, we hold that none of the complained-about circumstances rendered the identifications impermissibly suggestive or otherwise improper. Moreover, given the long period for observation of defendant by the witnesses during the criminal episode and periods of interaction, there existed an independent basis to identify defendant in court. *Gray*, 457 Mich at 114-116. Reversal is unwarranted.

Finally, we raise sua sponte a sentencing issue under our authority to "enter any judgment or order or [to] grant further or different relief as the case may require[.]" MCR 7.216(A)(7). In *Miller*, 567 US at ___; 132 S Ct at 2460, the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" A court's ability to sentence a defendant to life imprisonment absent the possibility of parole for a crime committed as a juvenile is not foreclosed; however, the court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 2469. In *Carp*, 298 Mich App at 537-538, this Court, examining *Miller*, held:

> The United States Supreme Court has, through a series of recent decisions culminating in *Miller*, indicated that juveniles are subject to different treatment than adults for purposes of sentencing under the Eighth Amendment. Specifically, we hold that in Michigan a sentencing court must consider, at the time of sentencing, characteristics associated with youth as identified in *Miller* when determining whether to sentence a juvenile convicted of a homicide offense to life in prison with or without the eligibility for parole. . . .

While *Miller* is applicable to those cases currently pending or on direct review, we find that in accordance with *Teague* [*v Lane*, 489 US 288; 109 S Ct 1060; 103 L Ed 2d 334 (1989),] and Michigan law that it (1) is not to be applied retroactively to cases on collateral review, such as Carp's, because the decision is procedural and not substantive in nature, and (2) does not comprise a watershed ruling. . . .

In the interim, as guidance for our trial courts for those cases currently in process or on remand following direct appellate review, we find that MCL 791.234(6)(a) [prisoner sentenced to life for first-degree murder is not eligible for parole] is unconstitutional as currently written and applied to juvenile homicide offenders. When sentencing a juvenile, defined now as an individual below 18 years of age for a homicide offense, the sentencing court must, at the time of sentencing, evaluate and review those characteristics of youth and the circumstances of the offense as delineated in *Miller* and this opinion in determining whether following the imposition of a life sentence the juvenile is to be deemed eligible or not eligible for parole. We further hold that the Parole Board must respect the sentencing court's decision by also providing a meaningful determination and review when parole eligibility arises.

Here, the record reflects that defendant was born on November 6, 1992, that the homicide was committed on July 14, 2010, making defendant 17 years old at the time, that defendant was sentenced to mandatory life for the first-degree murder conviction on November 21, 2011, that a claim of appeal was filed by defendant on December 8, 2011, and that defendant's appellate brief, which did not raise any sentencing issues, was filed with this Court on June 14, 2012. *Miller* was issued by the United States Supreme Court on June 25, 2012, and *Carp* was issued by this Court on November 15, 2012. Accordingly, defendant had been sentenced, had filed a claim of appeal, and had submitted his appellate brief all before *Miller* and *Carp* were decided. Because the case was at the stage of direct appellate review in this

Court when *Miller* and *Carp* were decided, *Miller* is applicable under the holding in *Carp*. In that procedural posture, our application of *Miller* does not constitute a collateral attack on the sentence, as opposed to the circumstances in *Carp*, where appellate review by this Court and our Supreme Court had been conducted and completed and the *Miller* argument was subsequently entertained in a motion for relief from judgment. Given the dictates of *Miller* and *Carp* and the Eighth Amendment implications, along with the procedural and factual aspects of the case at bar, we remand for resentencing in regard to the first-degree murder conviction in a manner consistent with *Miller* and *Carp*.

Affirmed in all respects, except that we vacate the sentence for first-degree murder and remand for resentencing consistent with this opinion. We do not retain jurisdiction.

FITZGERALD and HOEKSTRA, JJ., concurred with MURPHY, C.J.