# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DELVON HARTSON,

       Defendant-Appellant.

UNPUBLISHED
August 9, 2018

No. 338584
Wayne Circuit Court
LC No. 16-009813-01-FC

Before: RIORDAN, P.J., and K. F. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of second-degree murder (2 counts), MCL 750.317, assault with intent to murder (AWIM) (2 counts), MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to 40 to 85 years' imprisonment for each second-degree murder conviction, 25 to 60 years' imprisonment for each AWIM conviction, and a consecutive term of 2 years' imprisonment for the felony-firearm conviction. We affirm defendant's convictions and his felony-firearm sentence, but remand for the trial court to articulate its reasons for departing from the sentencing guidelines in imposing the second-degree murder and AWIM sentences and to establish a factual basis for the court costs imposed.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises from a shooting that occurred at 17510 Fielding in Detroit on October 14, 2016. After driving to that address, defendant's siblings—Tamara Hartson, Tajmas Hartson, Jasmine Hartson, and Yanni Bobo, engaged in a physical altercation with several people in the home. Eventually, the siblings retreated to Tajmas's car; as they were leaving, Tamara stated that she would "have my brother come back and shoot this b***h up." Ronnell Boyd threw a bicycle through the windshield of their car as it departed the scene.

Defendant received several calls from Jasmine immediately after this incident. The cellular phone records showed defendant's phone approaching the area of 17510 Fielding. Several witnesses observed four men in black hoodies approach the house at that address and begin shooting. A witness heard one of the men in hoodies say: "You think yaw [sic] going to get down on my brother and sisters like that." Latricia Howard identified defendant from a

photo lineup as one of the shooters.[1]  As a result of the shooting, Rashawn Jackson and Ronnell Boyd were killed and Tavona Boyd was injured.

A search warrant was executed at defendant's home.  No firearms were found, but officers did find a box for a .45 caliber handgun and .45 caliber ammunition, as well as defendant's concealed pistol licenses (CPL) for a .45 caliber Glock pistol and a 7.62mm short pistol version of an AK-47.  Neither weapon was found in defendant's home.

Tajmas testified, admitting to the fight but denying that anyone had made any threats about returning to the house.  Defendant's girlfriend testified that she had defendant's cellphone that day, and had exchanged calls with Jasmine after the fight.  An unrelated witness, Tamika Winfield, testified that she had seen defendant at a location on McCoy Street "shooting dice" between the relevant hours of 1:00 p.m. and 5:00 p.m. on October 14, 2016.

Defendant was convicted as described.  At sentencing, the prosecution requested that the trial court depart upward from the sentencing guidelines.  The trial court imposed the sentences described, which exceed the top of the guidelines range by 30 months for the murder convictions and by15 months for the AWIM convictions.

This appeal followed

## II.  PHOTOGRAPHIC LINE-UP

Defendant argues that the trial court erred by denying his motion to suppress Howard's identification, because the photograph used in the array presented by police to Howard was unduly suggestive and because it depicted him in a hoodie, which coincided with the description of the clothing worn by the shooter.  We disagree.

> A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous.  Issues of law relevant to a motion to suppress are reviewed de novo. Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made. [*People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013) (citations omitted).]

"A photographic identification procedure or lineup violates due process guarantees when it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *McDade*, 301 Mich App at 357.  The suggestiveness of a photographic lineup "must be examined in light of the totality of the circumstances."  *Id*. (citation and quotation marks omitted).  "As a general rule, physical differences between a suspect and other lineup participants do not, in and of themselves, constitute impermissible suggestiveness[.]"  *Id*. (citation and quotation marks omitted).  "Physical differences generally relate only to the weight

---

[1] Howard also attributed the referenced statement to defendant, but described it as "Yaw [sic] think you going to f*** with my people."

of an identification and not to its admissibility." *People v Hornsby*, 251 Mich App 462, 466; 650 NW2d 700 (2002) (citation omitted). Factors to be considered in evaluating pretrial identification procedures include: "the opportunity for the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of a prior description, the witness' level of certainty at the pretrial identification procedure, and the length of time between the crime and the confrontation." *People v Colon*, 233 Mich App 295, 305; 591 NW2d 692 (1998) (citation omitted).

Here, the photographic array presented to Howard was comprised of six photographs, including one of defendant. Defendant argues that he was the only one in the lineup wearing a hoodie, and that this was unduly suggestive because Howard had described the shooter as wearing a black hoodie. We note that, while defendant's photograph shows him wearing a hoodie, another photo in the array shows a different individual wearing a similar sweatshirt-like article of clothing, thereby making defendant's photograph less distinctive or unique within the array. See *People v Kurylczyk*, 443 Mich 289, 311-312; 505 NW2d 528 (1993) (stating that differences among participants in a lineup are "significant only to the extent they . . . substantially distinguish defendant from the other participants in the line-up . . . ."). More importantly, Howard's selection of defendant as the shooter from the array was immediate and unequivocal. She denied that her identification of defendant was based on his clothing. Rather, Howard stated that her identification was based primarily on defendant's eyes. Howard stated that she had been in close physical proximity to the shooter and had made eye contact with him during the event.

Under the totality of the circumstances, *McDade*, 301 Mich App at 357, Howard had a sufficient opportunity, albeit under highly stressful conditions, to observe the perpetrator. She provided a description to the police and when confronted with a photographic array immediately identified defendant as the perpetrator within days of the event. *Colon*, 233 Mich App at 305. Further, Howard explained that her selection of defendant's photograph was not based on his clothing. The record contains no evidence to support the conclusion that the photographic lineup was "constitutionally defective." *Colon*, 233 Mich App at 304. The trial court did not err by denying defendant's motion to suppress. *McDade*, 301 Mich App at 356.

### III. JUDICIAL BIAS

Defendant also argues that the trial court's questioning of Winfield demonstrated bias and pierced the veil of judicial impartiality, resulting in improper commentary on the credibility of defendant's alibi witness and therefore an improper influence on the jury. We disagree.

To preserve a claim of judicial bias or misconduct, a defendant must raise an objection in the trial court. *People v Sardy*, 216 Mich App 111, 117-118; 549 NW2d 23 (1996); *People v Conley*, 270 Mich App 301, 305; 715 NW2d 377. Defendant did not object to the questions posed by the trial court to Winfield, thereby failing to preserve this issue for appellate review; we review unpreserved claims of judicial bias for plain error affecting substantial rights. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011) (citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a

showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Defendant carries the burden of persuasion with regard to establishing prejudice.

A criminal defendant is entitled to a "neutral and detached magistrate." *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996) (citation omitted). A defendant asserting a claim of judicial bias must overcome "a heavy presumption of judicial impartiality." *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999). This Court will typically analyze comments and conduct by a trial court, in the following manner, to ascertain whether such conduct or comments deprived a defendant of a fair trial:

> Michigan case law provides that a trial judge has wide discretion and power in matters of trial conduct. This power, however, is not unlimited. If the trial court's conduct pierces the veil of judicial impartiality, a defendant's conviction must be reversed. The appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments "were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial." [*Conley*, 270 Mich App at 307-308, quoting *People v Collier*, 168 Mich App 687, 698; 425 NW2d 118 (1988) (citations omitted).]

In addition:

> Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias "unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality. [*Jackson*, 292 Mich App at 598 (citations omitted).]

As our Supreme Court stated in *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015):

> A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial.

In general, it is permissible for a trial court to "interrogate witnesses, whether called by itself or a party." MRE 614(b). "[T]he central object of judicial questioning should be to clarify," and "it is appropriate for a judge to question witnesses to produce fuller and more exact

testimony or to elicit additional relevant information." *Stevens*, 498 Mich at 173. Boundaries do exist, however, with regard to judicial questioning. "It is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally. It is essential that the judge not permit his own views on disputed issues of fact to become apparent to the jury." *Id*. at 174. Further:

> To ensure an appearance of impartiality, a judge should not only be mindful of the substance of his or her words, but also the manner in which they are said. A judge should avoid questions that are intimidating, argumentative, or skeptical. Hostile questions from a judge are particularly inappropriate when the witnesses themselves have done nothing to deserve such heated inquiry. [*Id*. at 175 (citations omitted).]

Throughout the trial in this case, the trial court occasionally posed questions to witnesses following the elicitation of testimony by the prosecutor and defense counsel and then provided an opportunity for the jurors to ask questions to be read by the trial judge. Defendant argues that one exchange of questioning by the trial court of defendant's alibi witness, Winfield, pierced the veil of judicial impartiality and demonstrated bias. We disagree.

The exchange between the trial court and Winfield consisted primarily of questions posed by the trial court regarding Winfield's actions on the day of the shooting and her claimed observation of defendant at a location removed from the Fielding residence:

> *Q*. You indicated that you went to the park to see your park friends?
>
> *A*. Yes, I be [sic] at Chandler Park where the old people be [sic] on Dickerson.
>
> *Q*. And that was at about 1:00?
>
> *A*. Yes.
>
> *Q*. And what do you all what were you all doing at the park in October that day?
>
> *A*. Oh, we sit out there we sits [sic] in our cars with the old people it be [sic] a lot of old people sitting on Chandler Park right over Dickerson and Frankford.
>
> *Q*. People sit in their cars?
>
> *A*. Yes.
>
> *Q*. And what do they do?
>
> *A*. They sit in the car and listen to music and drink out there.
>
> *Q*. With the windows up or the windows down.

*A*. No, the windows be [sic] down some cars be up [sic]. It be [sic] like 10 to 15 cars out there.

*Q*. And you sit in your cars?

*A*. Um hm.

*Q*. Is that a yes?

*A*. Yes, ma'am.

*Q*. You don't get out and socialize with each other.

*A*. No some people do. We got [sic] three benches out there. So some sits [sic] in the car some don't they [sic] all elderly people. So some sits [sic] in the car and some get out and sit on the bench. They play dominos they play spades out there.

*Q*. So on October 14th what were you doing that particular day.

*A*. I was in the park.

*Q*. Yeah, but were you on the bench were you playing spades were you in your car.

*A*. I was in my car I was listening to the radio.

*Q*. In your own car.

*A*. Yes, ma'am.

*Q*. And you windows were up or down?

*A*. My windows were up.

*Q*. What was the weather like that day do you remember.

*A*. It wasn't hot and it wasn't that cold.

*Q*. Would it surprise you to know that it was the low was that the weather was about 50 or 60 degrees that day?

*A*. No, it don't [sic] surprise me.

*Q*. And if weather was like 50 or 60 you would still go hang out in the park?

*A.* Yes, we be [sic] in the park when the sun be [sic] outside. We just sits [sic] in our car we go from car to car that's something that I do daily. I goes [sic] to the park with the old people I feel comfortable being around old people.

*Q.* Older people.

*A.* Yes.

*Q.* Now you indicated that your brother passed away?

*A.* Yes.

*Q.* And for a while you were not coming out of the house because you were sad?

*A.* Yes.

*Q.* How long did that last?

*A.* About two years it took me to go to church to get grips on I lost my brother. I was the [sic] keeping it to myself.

*Q.* So your brother passed away in like 2014?

*A.* 2012.

*Q.* 2012 and --

*A.* It took me two years to come back to myself.

*Q.* – and then you start going outside?

*A.* Yes, to be around people, yes.

*Q.* So by the time 2016 came along when this happened you were doing better and you were being more social?

*A.* Yes.

*Q.* Selling food sometimes.

*A.* Yes.

*Q.* Hanging out in the park everyday [sic].

*A.* Yes.

*Q.* All right.

Defendant does not specify that a particular question by the trial court was improper or suggest that the trial court's demeanor during the exchange with Winfield was hostile or inappropriate. Rather, defendant contends that the interaction between the trial court and Winfield implied that the trial court found her testimony not to be credible. Contrary to defendant's assertion, the exchange could at best be described as innocuous. The trial court was seeking to clarify Winfield's testimony regarding her routine activities that led to her observations and recall of defendant's presence in the park on a particular date and time. The trial court's questioning actually established that Winfield's visit to the park was not an anomaly and was consistent for the identified time period. Contrary to defendant's assertions, there is nothing to suggest that the trial court's questioning of this witness was improper or deprived defendant of a fair trial. The trial court's questions or responses did not state or imply disbelief or a personal view of Winfield's credibility. Defendant has not demonstrated plain error. *Jackson*, 292 Mich App at 597.

In addition, the trial court instructed the jury more than once that nothing the trial court said should be construed or interpreted by the jury as the expression of an opinion by the court. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Defendant therefore cannot demonstrate prejudice, even assuming that plain error occurred. See *Carines*, 460 Mich at 763.

## IV. DEPARTURE SENTENCES AND COURT COSTS

Defendant contends, and the prosecution concedes, that the trial court's imposition of sentences exceeding the guidelines range and an award of $1,300 in court costs, without explanation, necessitates a remand to the trial court for articulation of the factual basis for the upward departure sentences and the costs imposed. We agree.

A defendant need not take any special steps to preserve a challenge to a sentencing departure. *People v Smith*, 482 Mich 292, 300; 754 NW2d 284 (2008).

> A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness. Resentencing will be required when a sentence is determined to be unreasonable. Because sentencing courts will hereafter not be bound by the applicable sentencing guidelines range, this remedy cures the Sixth Amendment flaw in our guidelines scheme by removing the unconstitutional constraint on the court's discretion. Sentencing courts must, however, continue to consult the applicable guidelines range and take it into account when imposing a sentence. Further, sentencing courts must justify the sentence imposed in order to facilitate appellate review. [*People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015) (citations omitted.)]

The sentencing guidelines range for defendant's second-degree murder convictions was 270 to 450 months, premised on a total prior record variable (PRV) score of 27 and a total offense variable (OV) score of 215. The sentences imposed by the trial court exceed the higher end of the sentencing guidelines range by 30 months. The sentencing guidelines range for

defendant's AWIM convictions was 171 to 285 months; defendant's sentences for those convictions exceed the guidelines range by 15 months.

Although the sentencing guidelines are now advisory, "sentencing courts must justify the sentence imposed in order to facilitate appellate review," *Lockridge*, 498 Mich at 392, "which 'includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been,' " *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (citation omitted).

In this instance, the trial court acknowledged the applicable sentencing guidelines range, but then imposed a sentence that exceeded that range, without explaining the basis for the departure. The trial court simply stated that defendant was "put in a bad situation" and that "a lot of brothers in similar situations if they thought someone was doing serious harm to their sisters probably would have reacted similarly." None of the trial court's statements can reasonably be read as expressing the reasoning behind an upward departure. Therefore, as the prosecution agrees, remand is appropriate to permit the trial court an opportunity to articulate its reasons for departing from the sentencing guidelines.

The trial court also imposed $1,300 in court costs without explanation. MCL 769.1k(1)(b)(*iii*) authorizes a trial court to impose "any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case[.]" The statutory provision identifies examples of such costs, to include:

(A) Salaries and benefits for relevant court personnel.

(B) Goods and services necessary for the operation of the court.

(C) Necessary expenses for the operation and maintenance of court buildings and facilities. [MCL 769.1k(1)(b)(*iii*).]

In *People v Konopka*, 309 Mich App 345, 358; 869 NW2d 651 (2015), this Court held that "MCL 769.1k(1)(b)(*iii*) independently authorizes the imposition of costs in addition to those costs authorized by the statute for the sentencing offense." While the costs need not be "separately calculated," it is necessary, however, for the trial court to "establish a factual basis" for the costs imposed under the statute. *Konopka*, 309 Mich App at 359-360. When a factual basis has not been established for the costs imposed, the matter requires remand to afford the trial court an opportunity to establish the factual basis for the costs or to alter the amount as deemed necessary. *Id*. at 360. Therefore, as the prosecution also concedes, remand is required for the trial court to establish a factual basis or alter the amount of costs imposed.

## V. STANDARD 4 BRIEF

Defendant raises several additional issues in his Standard 4[2] brief.

## A. OFFENSE VARIABLE 14

Defendant argues that the trial court erred by assessing 10 points for OV 14 (defendant the leader in a multiple offender situation). We disagree. To preserve a challenge to an OV score, a defendant is required to raise the "issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed" with this Court. MCL 769.34(10). Defendant did not object to the assessment of 10 points for OV 14 at sentencing, and did not raise the issue in a motion for resentencing or a motion to remand. Because defendant's sentences were outside the guidelines range, we may review this issue for plain error. *People v Kimble*, 470 Mich 305, 312; 684 NW2d 669 (2004).

Even if OV 14 were to be assessed at zero points, a deduction of 10 points from the total OV score of 215 would not serve to alter the applicable sentencing guidelines range. In other words, the subtraction of 10 points from defendant's total OV score would not alter his OV level. Consequently, even if we found that the trial court had committed a scoring error, defendant would not be entitled to resentencing because any error in calculating defendant's guidelines range did not alter that range. See *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006). We decline to review this unpreserved issue further because defendant cannot demonstrate prejudice. *Kimble*, 470 Mich at 312.

## B. RIGHT TO A PUBLIC TRIAL AND INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he was denied his constitutional right to a public trial because the trial court limited the number of his family members who could be seated in the courtroom during the jury selection process, or in the alternative that his trial counsel was ineffective for failing to object to this limitation. We disagree.

"[A]n issue is preserved for appellate review when the issued was raised, addressed, and decided by the lower court." *People v Metamora Water Serv, Inc*, 276 Mich App 376, 383; 741 NW2d 61 (2007). To preserve an ineffective assistance of counsel claim, a defendant must raise the issue in a motion for a new trial or a motion for a *Ginther*[3] hearing in the trial court. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Neither defendant nor his trial counsel raised the issue before the trial court of the alleged exclusion of the public from the voir dire of defendant's jury or suggested that counsel was ineffective for having failed to raise the issue to the trial court in a motion for a new trial or a *Ginther* hearing. These issues are therefore unpreserved.

---

[2] A supplemental appellate brief filed in propria persona by a criminal defendant under Michigan Supreme Court Administrative Order 2004-6, Standard 4.

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

We review unpreserved claims of error for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. "Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law." *People v Vaughn*, 491 Mich 642, 649-650; 821 NW2d 288 (2012). We review for clear error a trial court's factual determinations, and review de novo whether defendant's counsel's conduct constituted effective assistance. *Id*. Our review of defendant's unpreserved ineffective assistance of counsel claim is limited to "mistakes apparent on the record." *Petri*, 279 Mich App at 410. We review de novo issues of statutory interpretation. *People v Rose*, 289 Mich App 499, 505; 808 NW2d 301 (2010).

The Michigan and United States Constitutions provide the right to a public trial. US Const, Am VI; Const 1963, art 1, § 20. The right to a public trial encompasses the right to public voir dire proceedings. *Vaughn*, 491 Mich at 652-653. However, "[a]lthough a public trial is guaranteed by the Constitution, our Legislature has specifically provided that 'for good cause' witnesses may be excluded." *People v Insley*, 36 Mich App 593, 597; 194 NW2d 20 (1971) (citation omitted). Therefore, "[a] defendant's Sixth Amendment right to a public trial is limited." *Vaughn*, 491 Mich at 653. A courtroom may be closed, despite a defendant's objection, where "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. at 653; MCR 8.116(D). A less restrictive standard is applicable when a courtroom is only partially closed. "Because the effect of a partial closure does not reach the level of total closure, only a substantial, rather than a compelling, reason for the closure is necessary." *People v Kline*, 197 Mich App 165, 170; 494 NW2d 756 (1992). Further, a broader and more encompassing precept is also relevant, which pertains to a trial court's "entitle[ment] to control the proceedings in its courtroom." *People v Johnson*, 315 Mich App 163, 179; 889 NW2d 513 (2016). This right of control by the trial court, however, cannot come "at the expense of a defendant's constitutional rights." *Id*.

In this instance, the record does not reflect any specific intention or instruction to close the courtroom during voir dire. Defendant's assertion that he was denied a public trial is based on the following discussion between the trial court and defense counsel that occurred before jury selection on the first day of trial:

> *THE COURT*: So the deputies are going to give destructions [sic] to the people that are in the audience. And I believe um we probably have room for is any of your client's family here?

> *DEFENSE COUNSEL*: Your Honor I have his mother sitting in the back of the courtroom.

> *THE COURT*: Okay. She will be able to stay and then the two members of the victim's [sic] family.

> *DEFENSE COUNSEL*: There is one other family member.

*THE COURT*: All right. That's fine we have room for the four of them to stay I'm sure.

*DEFENSE COUNSEL*: Thank you.

*THE COURT*: Whenever you are ready Corporal.

*BAILIFF*: Okay. If you are not on this trial you have to wait in the hallway.

Before this exchange, the prosecution and defense counsel had requested that testifying witnesses be sequestered, and the trial court granted the request. Notably, defendant does not contend that access to the courtroom was denied to the public during the trial proceedings or for the delivery of the verdict, nor does he identify any individuals who were excluded during any stage of the proceedings.

Further, members of the public, including defendant's family members, were present during voir dire. The exclusion of certain other individuals was the product of defense counsel's and the prosecution's request that any witnesses be sequestered to avoid possible influence. Defendant does not identify any specific individuals who were precluded from being present for the voir dire. Based on the exchange between the trial court and defense counsel, it appears that the trial court was attempting to ensure that individuals with a personal connection to the trial had the opportunity to be present for this stage of the proceedings. Similarly, the comment by the bailiff suggests that only persons not associated with or interested in defendant's trial were asked to vacate the premises. Presumably, due to the space taken up by the jury pool awaiting voir dire, space was limited in the courtroom. The "limited capacity of the courtroom" comprises "a substantial reason for" a closure and does not serve to "deny [a] defendant his right to a public trial." *People v Russell*, 297 Mich App 707, 720; 825 NW2d 623 (2012). Consequently, defendant has not demonstrated any error, much less plain error, in the voir dire proceedings. *Kline*, 197 Mich App at 170.

For the same reason, defendant has also not established that his defense counsel's failure to object to the asserted closure of the courtroom constituted ineffective assistance of counsel. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## C. ADMISSIBILITY OF EVIDENCE

Defendant also argues that the trial court erred by admitting a hearsay statement allegedly made by defendant's sister, Tamara, comprising a threat before the shooting. Further, according to defendant, the trial court erred by permitting photographs of weapons downloaded from defendant's cellular telephone to be admitted into evidence, even though the weapons were not linked or shown to be relevant to or involved in the shooting. We disagree with both assertions.

"This Court reviews a trial court's evidentiary ruling for an abuse of discretion." *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v*

*Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). We review de novo preliminary questions of law surrounding the admission of evidence, such as the interpretation of a rule of evidence. *Id*. at 723. "A preserved error in the admission of evidence does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013) (citation and quotation marks omitted).

Defendant argues that the trial court erred by admitting testimony that Tamara had stated that she would have her brother return to the home on Fielding and "shoot this b***h up," and also by admitting photographs of firearms retrieved from defendant's cellular telephone.

"Hearsay is 'a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' Hearsay is generally prohibited and may only be admitted at trial if provided for in an exception to the hearsay rule." *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010), quoting MRE 801(c) and citing MRE 802.

The Michigan Rules of Evidence provide an exception where the statements are of a declarant's "then existing state of mind, emotion, sensation, or physical condition." MRE 803(3). Specifically, a hearsay exception exists for:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will. [MRE 803(3).]

In addition, a hearsay exception exists for excited utterances, which comprise: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." MRE 803(2). The trial court found Tamara's statement admissible under these hearsay exceptions.

At trial, White, the homeowner of 17510 Fielding, and his mother testified regarding the threatening statement by Tamara.[4] When Tamara made the statement, she had just been involved in fisticuffs with Blake, her siblings and others at the Fielding Street home. Assuming the testimony relating to Tamara's statement to have been hearsay, the trial court did not err by holding that the statement related to a "startling event" and occurred while Tamara "was under the stress of excitement" and expressed her "existing state of mind [and] emotion" regarding her future intentions or plans, as contemplated by MRE 803(2) and (3). This Court has deemed similar statements admissible. See e.g., *People v Coy*, 258 Mich App 1, 13-14; 669 NW2d 831 (2003). Because we hold that the trial court did not err by admitting the statement under these exceptions, we do not address the trial court's determination that the evidence was also admissible as the nonhearsay statement of a coconspirator. See MRE 801(d)(2).

---

[4] Defendant's argument on appeal only appears to contest the admission of White's testimony.

Defendant also challenges the trial court's admission of photographs of firearms retrieved from his cellular telephone, which were not specifically linked to the weapon used in the shooting. Photographic evidence is admissible if relevant, pertinent, competent, and material to any issue in the case. See *People v Eddington*, 387 Mich 551, 562; 198 NW2d 297 (1972). The photographs from defendant's cellular telephone were relevant because they demonstrated that defendant had access to the type of weapon used to fire at the Fielding Street residence. Since the police did not recover the weapon used in this shooting, and there was no other evidence showing that defendant had access to this type of weapon, this evidence had probative value. MRE 401, 402. Howard described the weapon used by the shooter as an "Uzi," with extended or extra clips. Several 9 millimeter and .45 caliber shell casings were found at the front of the home. The search of defendant's home revealed .45 caliber rounds but no weapons. Defendant had CPLs for a .45 caliber handgun and a 7.62 short pistol version of an AK 47. Officer Mark Lambert of the Michigan State Police testified that one of the photographs admitted into evidence showed defendant with a "short barrel machine gun like pistol" similar to an Uzi. Consequently, the photographs were relevant, pertinent, competent, and material to issues in the case, and the admission of the photographs was not an abuse of discretion by the trial court. *Eddington*, 387 Mich at 562.

Further, even if the admission of the photographs were deemed to be in error, defendant cannot demonstrate that it is "more probable than not" that the evidence was outcome determinative. See *Burns*, 494 Mich at 110; see also *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). Howard positively identified defendant as the shooter. Cellular telephone records support the conclusion that defendant was traversing the city of Detroit, from east to west, after his siblings were involved in an altercation at the Fielding address. Tamara's threat, coupled with the statement from one of the shooters (attributed by Howard to defendant) suggesting that his actions were in retribution for acts relating to family members, were more than sufficient to convict defendant even without the admission of the photographs.

## D. JURY INSTRUCTIONS

Finally, defendant argues that the trial court erred by failing to provide the jury with a requested instruction for voluntary manslaughter. We disagree.

Defendant's counsel requested such an instruction, which the trial court denied; the issue is therefore preserved. *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000). "[J]ury instructions that involve questions of law are also reviewed de novo. But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (citations and quotation marks omitted).

Defendant was charged with two counts of first-degree murder, MCL 750.316, but convicted of second-degree murder, MCL 750.317. Defendant requested instructions on second-degree murder and voluntary manslaughter. The trial court agreed to provide a second-degree murder instruction, but required defense counsel to present an argument for the inclusion of an

instruction on voluntary manslaughter.[5]   Defense counsel, in asserting the propriety of a voluntary manslaughter instruction, argued as follows:

> This is our alleged argument that . . . we're alleging that there is a fight that take [sic] place earlier in the afternoon on Fielding street.  It was a very heated moment people very angry minutes later, 15 minutes later, people come and shoot up this house on Fielding [S]treet where two people die.  And . . . it was not a cooling off period continuously from the time this fight took place up until the time the shooters left the scene.

In denying the request, the trial court stated:

> Well, I think that's what gets you to murder two but not involuntary [sic] manslaughter.  I am not going to give involuntarily [sic] manslaughter.  But this does not mean that depending on what the further testimony is it doesn't give you an opportunity to make another argument at a later point if there's additional evidence that you think will support it.  Okay.

Our Supreme Court has explained and distinguished the concepts of manslaughter (both voluntary and involuntary) and murder as follows:

> Regarding voluntary manslaughter, both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result.  However, the element distinguishing murder from manslaughter-malice-is negated by the presence of provocation and heat of passion.  Thus, we conclude, the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice.

> Regarding involuntary manslaughter, the lack of malice is evidenced by involuntary manslaughter's diminished mens rea, which is included in murder's greater mens rea.

---

[5]  We note that, in the relevant transcript, the trial court appears to refer to "involuntary manslaughter."  It matters not whether this is a transcription error or a misstatement by the trial court, because defense counsel was clear in asking for an instruction on voluntary manslaughter (though not correcting the trial court's apparent reference to involuntary manslaughter).  In any event, while not requested by defendant, there was also no demonstrated basis for an instruction on involuntary manslaughter.  Defendant's arrival at the Fielding Street home, shooting a weapon at the occupied dwelling with people in close proximity, as well as firing directly into the front room of the home, does not evidence "an unintended result" or "less than an intent to do great bodily harm, an intent to kill, or the wanton and wilful disregard of its natural consequences." *Mendoza*, 468 Mich at 541 (citation omitted).

* * *

Unlike murder, involuntary manslaughter contemplates an unintended result and thus requires something less than an intent to do great bodily harm, an intent to kill, or the wanton and wilful disregard of its natural consequences.

* * *

Thus, we conclude that the elements of involuntary manslaughter are included in the offense of murder because involuntary manslaughter's mens rea is included in murder's greater mens rea.

Accordingly, we hold the elements of voluntary and involuntary manslaughter are included in the elements of murder. Thus, both forms of manslaughter are necessarily included lesser offenses of murder. . . . Consequently, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence. [*People v Mendoza*, 468 Mich 527, 540-541; 664 NW2d 685 (2003) (citations omitted).]

This Court has stated that

the degree of provocation required to mitigate a killing from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. Further, in order for the provocation to be adequate it must be that which would cause a reasonable person to lose control. Whether the provocation was reasonable is a question of fact; but if no reasonable jury could find that the provocation was adequate, the court may exclude evidence of the provocation. [*People v Mitchell*, 301 Mich App 282, 286-287; 835 NW2d 615 (2013) (citations, quotation marks and brackets omitted).]

Based on the evidence presented at trial, the trial court properly declined to provide a voluntary manslaughter instruction because of the absence of "the degree of provocation required to mitigate a killing from murder to manslaughter." *Id*. Defendant was not present during the fight involving his siblings, but only later learned of the altercation. Defendant had to travel across town by car to arrive at the Fielding Street address. By that time, the altercation with his siblings had ended and they had left the area. While the incident may have angered defendant, his lack of involvement in the underlying events, the necessity and time required to travel across town, and the absence of any physical injury to his siblings, demonstrate the absence of adequate provocation for the shootings. Because no reasonable jury could find that the provocation in this matter was adequate to cause a reasonable person to lose control in the manner that defendant did, the trial court did not err by denying defendant's request for an instruction on voluntary manslaughter. *Id*.

## VI.  CONCLUSION

We affirm defendant's convictions and his felony-firearm sentence, but remand this matter to the trial court for articulation of the reasons for departing from the sentencing guidelines in imposing the second-degree murder and AWIM sentences and to establish a factual basis for the imposition of $1,300 in court costs.  We do not retain jurisdiction.


/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra