*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DALLAS AUGUSTA MCDADE, JR.,

Defendant-Appellant.

UNPUBLISHED
January 22, 2019

No. 323614
Kalamazoo Circuit Court
LC No. 2010-001328-FC

ON REMAND

Before: BOONSTRA, P.J., and SAWYER and MARKEY, JJ.

PER CURIAM.

Defendant was convicted by a jury of first-degree premeditated murder, MCL 750.316(1)(a), along with a number of firearm and assault offenses. Defendant was sentenced to mandatory life imprisonment without the possibility of parole for the first-degree murder conviction. This Court affirmed defendant's convictions, but, because defendant was 17 years old when the murder was committed, it sua sponte vacated the murder sentence and remanded the case for resentencing consistent with the directives in *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012). *People v McDade*, 301 Mich App 343; 836 NW2d 266 (2013). Following remand and an evidentiary hearing under newly-enacted MCL 769.25 and *Miller*, the trial court once again sentenced defendant to life imprisonment with no parole for the murder conviction. On appeal to this Court, we again vacated defendant's first-degree murder sentence, given that this Court had held in *People v Skinner*, 312 Mich App 15; 877 NW2d 482 (2015), rev'd 502 Mich 89 (2018), that a juvenile murderer has a Sixth Amendment right to a jury trial on the issue of whether he or she should be sentenced to life imprisonment without parole or to a term of years, rendering MCL 769.25 partially unconstitutional. *People v McDade*, unpublished per curiam opinion of the Court of Appeals, issued January 19, 2016 (Docket No. 323614). Our Supreme Court granted the prosecutor's application for leave to

appeal in *Skinner. People v Skinner*, 500 Mich 929 (2017).[1] On application for leave to appeal in the instant case, the Michigan Supreme Court ordered the application be held in abeyance pending a decision by the Supreme Court in *Skinner* and *Hyatt. People v McDade*, 895 NW2d 510 (2017). The Supreme Court thereafter issued its decision in *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018), holding that MCL 769.25(6), which provides for sentencing by judges not juries for juvenile offenders committing mandatory life offenses, is not unconstitutional and that a judge's decision is to be reviewed under the traditional, not a heightened, abuse-of-discretion standard. Subsequently, our Supreme Court vacated our prior opinion in *McDade* and remanded the matter to us to determine whether the trial court abused its discretion in sentencing defendant to life imprisonment without the possibility of parole. *People v McDade*, 920 NW2d 117 (2018). Finding no abuse of discretion, we affirm defendant's sentence of life imprisonment without parole.

The underlying facts in this case were set forth by this Court in *McDade*, 301 Mich App at 346-348:

> On July 14, 2010, James Warren went to a store in Kalamazoo where he spoke to defendant about acquiring some marijuana for resale in a profit-sharing arrangement. There was no drug transaction at the store, and instead defendant and Warren proceeded by bicycle to a home on Washington Avenue. Warren knew Lenell Ewell, who was often at the house. Ewell was friends with Carlton Freeman, and Freeman resided in one of the units in the subdivided house. Freeman, Ewell, and a mutual friend, Erick Jenkins, were at the home when defendant and Warren arrived at about 5:30 p.m. According to Warren, defendant gave him some marijuana to sell and a small amount of cash to make change when Warren sold the marijuana, and Warren rode away on defendant's bicycle, while defendant remained at the house to await Warren's return. Ewell had indicated that defendant could remain at the location while awaiting Warren's return, which ultimately never did transpire.

> Freeman, Jenkins, Ewell, and defendant went into the backyard of the Washington Avenue home after Warren left the premises. Ewell and Jenkins were drinking beer, Freeman was not. Time passed absent Warren's return, and defendant eventually spoke to someone on his cellular telephone. Defendant appeared to become frustrated and started making accusatory statements

---

[1] In *People v Hyatt*, 314 Mich App 140; 885 NW2d 900 (2016), a panel of this Court abided by but voiced its disagreement with this Court's earlier decision in *Skinner*, and a conflict was later declared under MCR 7.215(J). The conflict panel unanimously disagreed with *Skinner* and held that a judge can determine whether to impose a non-parolable life sentence on a juvenile offender. *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016), aff'd in part and rev'd in part 500 Mich 929 (2017). On the same day that it granted leave in *Skinner*, the Supreme Court entered an order granting oral argument in *Hyatt* and consolidated it with *Skinner. People v Hyatt*, 500 Mich 929 (2017).

concerning the other three men. They, however, expressed befuddlement and denied involvement in a scam against defendant. Freeman testified that defendant rejected their denials and remained angry at them. Defendant subsequently walked around to the front of the house where another individual, Marlen Stafford, was waiting. Freeman, Jenkins, and Ewell followed defendant around the house and stepped onto the home's porch, while defendant continued walking to the sidewalk where Stafford was standing. At some point, defendant told the group on the porch that "[h]e wasn't leaving till he got his stuff back." According to Freeman, defendant then took out a revolver and stated that "[s]omebody . . . was gonna die[.]" Freeman and Jenkins ran into the backyard and defendant began shooting. Freeman escaped, Jenkins did not. Ewell remained on the porch. He testified that he did not even realize that he had been shot until he heard someone say, "You got shot—."

Officer Brian Cake was the first officer to respond to the shooting at the home. . . . Jenkins was found in the backyard with a single bullet wound to the back. He was pronounced dead shortly thereafter. [Footnote omitted.]

After the initial appeal, the prosecution sought a life sentence for defendant without the possibility of parole. On August 22, 2014, the trial court conducted a resentencing evidentiary hearing for defendant under MCL 769.25.[2] Defendant called Desmond Patton as a witness in support of his argument that he should not be sentenced to life without parole. Patton, an assistant professor at the University of Michigan School for Social Work, studied African-American males and how they experience violence in their communities. Patton has a master's degree and a Ph.D. in social work and had served as an expert witness in another "*Miller* type case." Patton testified that he did a psychosocial assessment of defendant to learn about his life and family history. He prepared a report on his findings, which was admitted into evidence. According to Patton, defendant was labeled as a violent, bad person over the course of his life.

---

[2] MCL 769.25, which took effect March 4, 2014, under 2014 PA 22, provides, in pertinent part:

> (6) If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in Miller v Alabama, 576 US [460]; 183 L Ed 2d 407; 132 S Ct 2455 (2012), and may consider any other criteria relevant to its decision, including the individual's record while incarcerated.

> (7) At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing.

Patton testified that defendant had trouble with school from early on in his life. He further testified that when defendant did get into trouble, there were times where he wrote letters apologizing to teachers. Thus, Patton opined that defendant was capable of remorse.

With respect to defendant's home life, Patton testified that defendant "grew up in a suburban community [] in Kalamazoo; a very quaint, nice, middle class community." Patton asserted, however, that defendant struggled because "he was living in a community that didn't quite match his own African American identity" and that disparity caused some problems in his life. Patton further testified that defendant's high school was more ethnically diverse, so defendant "was caught in a—in a conundrum, if you will, of trying to be an African American male in a setting that was very diverse." According to Patton, defendant sought attention from his peers, who were not great peers because they were often "getting into minor offenses." With respect to the instant offense, Patton testified that defendant had not had the opportunity to think very deeply about what transpired or to be reflective regarding his actions. In regard to defendant's characteristics that might provide hope for change, Patton stated:

> [Defendant] lit up when [they] talked about his family. Particularly, he comes from a very strong family in which he—which he had the support of his mom and dad and brother as well. He has 3 children that he cares very deeply about. . . . [H]e remarked that he wanted to get out so that he could be a part of their life and that was very important to him.

Patton indicated that defendant wanted to become a mechanic. Patton concluded his direct examination by testifying that defendant's age and immaturity played a big role in the instant offense.

On cross-examination, the prosecutor elicited testimony from Patton, who had reviewed defendant's juvenile record, that defendant's criminal history involved breaking and entering, larceny in a building, stealing automobiles, retail fraud, and assaulting people. Patton further testified that defendant was not subject to psychological testing as a part of Patton's review. Patton stated that his study of defendant included reviewing his juvenile record, school record, and speaking to his football coach and his mother, but that defendant himself had provided the rest of the information. Patton testified that he spoke with defendant regarding the instant offenses and that defendant did not accept responsibility for them, i.e., he denied involvement in the crimes. Further, Patton observed that defendant was approximately 22 years old when he interviewed him.

Following Patton's testimony, the prosecution called as a witness Marcus Monroe, defendant's probation officer. Monroe testified that he first came into contact with defendant in October 2007. At that time, defendant had already been involved with the juvenile justice system and was on moderate probation, which required a higher amount of contact and more intensive work with the probation officer. Monroe further testified that he worked with the more troubled children. According to Monroe, a juvenile's first petition on a criminal charge was labeled as "A" in Kalamazoo, and subsequent juvenile petitions were marked in alphabetical order. Monroe testified that defendant was on petition K when he began working with defendant. Monroe further indicated that defendant was on moderate probation for approximately eight months but that he was unsuccessful in completing that probation. As a

result, defendant was ordered into a day treatment program, in which he participated for approximately 26 months. Monroe explained that a day treatment program differs from a residential treatment program in that the juvenile receives a structured educational component and treatment services during the day but is able to return home during nights and weekends. Monroe testified that defendant was ultimately unsuccessful in completing the program, but, on what Monroe characterized as a "positive note," there were "only" two petitions during defendant's day treatment—one for stealing a vehicle and one for resisting and obstructing a police officer. Monroe also testified that defendant ran from probation and "went AWOL from the program" four times. When asked whether defendant appeared to be making positive changes by participating in the program, Monroe stated:

> [H]e was engaged in the group process and even individuals, but I don't think [he was] really . . . invested in pretty much anything. He would go through the motions. I know [defendant] was capable, but [he] sometimes chose not to participate or be invested into the stuff that we tried to teach him.

According to Monroe, defendant consistently blamed others for his mishaps and did not take any ownership of his actions and conduct. Monroe testified that defendant had supportive parents in his home and an employed father who talked to his son. Monroe claimed that he attempted to mentor defendant to adjust his behavior. But defendant "aged out" of the program at 17 years old, so he was discharged.

On cross-examination, Monroe testified that other juveniles experienced problems similar to defendant's. Monroe further indicated that he could not say whether defendant was a "los[t] cause." Monroe concluded his testimony by stating that although defendant did have violations while on probation, the number of violations decreased when he was under the supervision of the day treatment program.

Defendant argued that the trial court had to examine the factors in *Miller* to comply with MCL 769.25. Defendant urged the trial court to consider Patton's testimony and his report. Based on the *Miller* factors and Patton's testimony, defendant argued that the trial court should sentence him to a term of years "at the bottom of the suggested guideline of approximately 25-years." When defendant was provided an opportunity at allocution, he stated:

> I just want to say, you know, that I just want to be, you know, looked at as a man. You know, I got a family out there (inaudible). I was just a wild individual or a terrorist or whatever, however you want, you know what I'm saying, describe the painting. But, like I say, I do got a family out there and I do got things to look forward to when I come home. I just hope and pray you look for—look at me as a man and make the best decision for me to get home early as possible man. It's just man—I'm sorry for the loss or whatever may have happened, you know what I'm saying, but—with this—man. I just want to go home, man. That's it.

After defendant spoke, Lisa Ford, the decedent victim's mother, explained that she buried her son approximately four years ago and that she was at the hearing—not for revenge—but to seek justice. Ford indicated that while she understood that defendant had children, the victim did

not take any of those children from defendant. Ford stated that her son was never coming home, so she asked the court to impose a sentence of life without parole.

The prosecution argued that defendant had been convicted of first-degree premeditated murder—this was not a felony murder, second-degree murder, or manslaughter case. The prosecution contended that defendant's case was distinguishable from *Miller* because the defendants in *Miller* were both 14 years old, were convicted of felony murder, acted with other individuals, and were from chaotic or abusive households. The prosecutor contrasted the instant case by arguing that defendant was four months away from being 18 years old when he committed the crime, that he tried to kill three people after an argument over marijuana, that he came from a good family, and that defendant directly committed the murder rather than being an accomplice. The prosecution further maintained that defendant had a substantial criminal history and that the justice system exhausted its resources trying to rehabilitate him. The prosecution added that there was nothing in the record to indicate that defendant had the potential for rehabilitation—he would not "even own the fact that he committed this crime." The prosecution also contended that defendant was on a felony bond for a drug offense when he killed Jenkins and that defendant's preliminary examination for that offense was the day before he murdered Jenkins. In light of all of these facts, the prosecution argued that defendant's murder conviction was not the result of a youthful indiscretion and that defendant should receive life without parole.

The trial court began its ruling by stating that MCL 769.25 provided it with two options: (1) reinstate defendant's original sentence of life without parole; or (2) sentence defendant to a term of years with a minimum term somewhere between 25 and 40 years and a maximum term of not less than 60 years. The trial court then summarized each of the parties' arguments and explained that defendant displayed three criminal attributes: "anti-social cognition, anti-social companions, [and] anti-social temperament." The trial court next stated that *Miller* required the court to consider defendant's age, his family circumstances and relationships, the circumstances of the offense, and the possibility for rehabilitation. With respect to age, the trial court noted that defendant was only four months shy of being 18 when he committed the offense. In regard to defendant's family background, the trial court stated that defendant was not from a dysfunctional family and grew up in a lovely two-parent home, which offered him love, affection, and support.

With respect to the circumstances of the offense, the trial court indicated that they could be characterized as "very destructive." The trial court reasoned that the instant offense was not the result of a "pitched battle" or a fight where other people were firing back at him; rather, this was an offense where "defendant basically lost his temper." The trial court observed that there was no logical connection between the victims and the individual who took defendant's drugs, but defendant nevertheless focused on those physically nearest him. The trial court further explained that "[t]his [was] somewhat disconcerting . . . because it signals an individual who is not focused on a rational relationship between a wrong and retribution for the wrong, but is someone who simply believes that if he feels wrong[ed] he is entitled to lash out at whoever happens to be the unfortunate victim in the path of his wrath."

The trial court next indicated that *Miller* requires a court to look at the potential for rehabilitation and that an individual should not be "considered a throwaway person." The trial court proceeded to state that rehabilitation was a core principle of the criminal justice system and that it is important for an individual who commits a wrong to acknowledge the wrong, accept

responsibility, move on, and "tr[y] not to engage in any illegal conduct in the future." The trial court additionally observed that accepting responsibility for one's errors is a big part of the solution and that the individual must initiate steps toward rehabilitation. Subsequently, the trial court addressed defendant's criminal history, noting that the presentence investigation report (PSIR) revealed that defendant had been convicted of a prior felony, possession of a controlled substance less than 25-grams, and was on probation for that felony at the time of the instant offenses. The trial court then determined that defendant's potential for rehabilitation was "slim." The court reasoned that, looking at defendant's life, he had not taken ownership or responsibility for any of his misdeeds. This encompassed the juvenile offenses for which defendant had been adjudicated and the adult offenses for which defendant was convicted. According to the trial court, it did not appear that defendant had taken "ownership of his life." Thus, the court opined that defendant could not be rehabilitated. Upon consideration of the *Miller* factors, the record, and defendant's PSIR, the trial court concluded that defendant's case was not one where a term-of-years sentence was appropriate. Therefore, the trial court resentenced defendant to life imprisonment without the possibility of parole for his first-degree murder conviction.

On appeal, defendant argues that when imposing a sentence on a minor, a court must provide individualized consideration, taking into account the relevant mitigating factors set forth in *Miller*, and here the trial court abused its discretion by not considering the relevant mitigating *Miller* factors. We disagree.

We review the trial court's sentencing decision under the traditional abuse of discretion standard. *People v Skinner*, 502 Mich 89, 131; 917 NW2d 292 (2018). A trial court abuses its discretion when it makes a decision falling outside the range of reasonable and principled outcomes. *Id.* at 133. A sentence constitutes an abuse of discretion when that sentence violates the principle of proportionality, which requires that a sentence be proportionate to the seriousness of the circumstances surrounding the offense and the offender. *Id.* at 131-132.

The *Miller* factors include consideration of the chronological age of the defendant, the defendant's family and home environment, the circumstances surrounding the offense, including the extent of the defendant's participation, the defendant's history, whether the defendant could have been charged and convicted of a lesser crime, and the possibility of rehabilitation. *Miller*, 567 US at 477-479.

Here, the trial court considered potential mitigating circumstances, including defendant's family background, his age and maturity, the circumstances of the offense, his history, and defendant's potential for rehabilitation. Defendant specifically challenges the trial court's reasoning with respect to rehabilitation. After the trial court discussed defendant's criminal history and the PSIR, the court, as mentioned earlier, observed:

> This court is convinced that the defendant's possibility of rehabilitation is slim. There does not appear to be, over the course of this defendant's life, an ownership of the fact that the defendant has some responsibility for his life. Whether that is in the form of the juvenile offenses for which the defendant has been adjudicated, or the adult offenses for which the defendant was convicted or pled. It does appear that this defendant has not taken ownership of his life.

Accordingly, the trial court considered defendant's extensive criminal history and used it to weigh defendant's prospects for rehabilitation.

The facts in this case are as follows: defendant was four months away from being 18 years old when he committed the murder; he had an extensive criminal record with numerous failed efforts at rehabilitation; he came from a stable, loving two-parent home, not a "brutal or dysfunctional" family, *Miller*, 567 Mich at 477; and he alone initiated and carried out the attack. He was not simply an aider, abettor, or accomplice, and there was no lesser homicide charge that fit the events that transpired. Instead, with premeditation and deliberation, defendant shot the defenseless victims after telling them that somebody was going to die over a perceived wrong regarding some marijuana. Under these circumstances and the applicable *Miller* factors, the trial court's decision to impose a life sentence without the possibility of parole did not constitute an abuse of discretion; it fell within the range of reasonable and principled outcomes and was proportionate to the seriousness of the circumstances surrounding the offense and the offender. Defendant's arguments to the contrary are unavailing in light of the existing record.

We affirm.

/s/ Mark T. Boonstra
/s/ David H. Sawyer
/s/ Jane E. Markey