*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 26, 2019

Plaintiff-Appellee,

v

No. 336843
Wayne Circuit Court
LC No. 16-003223-01-FC

RODRIGUES RODNEY TALBERT,

Defendant-Appellant.

Before: SHAPIRO, P.J., and BECKERING and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Rodrigues Talbert, appeals as of right his bench trial conviction of felony murder, MCL 750.316(b). For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

On February 4, 2006, Corey Phillips drove to a house located on St. Mary's Street in Detroit, Michigan. While his girlfriend, Nicole Vaid,[1] waited in the car, he took a backpack or duffle bag of marijuana into the house with the intention of selling it. Vaid testified that she heard gunshots from the house and then she saw two men in their 20s come out of the front door.

Vaid explained that before that night she had never seen either of the men. However, in February and March 2006, she identified the second man who exited the house as Harold Walton, first in a photographic lineup and then at Walton's preliminary examination.[2]

---

[1] Nicole Vaid was known as Nicole Hall at the time of the murder. For ease of reference and consistency, we will refer to her as "Vaid."

[2] Following a March 2006 preliminary examination, Walton was bound over to the circuit court on charges of first-degree premeditated murder, felony murder, felon in possession of a firearm, and possession of a firearm during the commission of a crime. However, a motion to quash the bindover was granted. As will be explained later in this opinion, the records associated with

Subsequently, in 2016, Vaid identified Talbert as one of the men who exited the house. She identified Talbert first during an in-person lineup, then at Talbert's preliminary examination, and finally at Talbert's trial.

At Talbert's trial, she testified that the men got into a vehicle and left. Vaid pulled her vehicle into the driveway and entered the house. Inside, she discovered Phillips lying on the floor in a pool of blood, but she did not see the bag of marijuana. According to the medical examiner who reviewed the autopsy report, Phillips died from multiple gunshot wounds. He was shot twice in the head, once in the abdomen, and once in the left forearm. The medical examiner opined that, based on stippling, the weapon used was less than 36 inches from Phillips's head when it was fired. The bullet trajectory was also at a downward angle for the gunshot wounds to Phillips's head.

The police collected evidence, including shell casings and swabs of blood located on the front door and on a microwave in the kitchen. The blood on the microwave was bright red and smeared. It was determined that the shell casings were all fired from the same gun.

Initially, the owner of the blood on the door and the microwave was unidentified. Yet, eventually law enforcement received a hit on CODIS, a DNA bank where DNA is stored to allow for comparisons to convicted felons' profile at a later date. In response, law enforcement obtained a search warrant for Talbert's DNA. While executing the search warrant, an officer explained to Talbert that his blood had been located at the house where Phillips was murdered, and the police showed Talbert a photograph of the house and the blood. In response, Talbert stated that it was not his blood and that he had never been to the house before. He did not tell the officer that he had been shot at that location. He did, however, cooperate and provide a buccal swab to the police. Based on the buccal swab, a DNA profile for Talbert was developed. Additional testing was performed on the blood located on the door and the microwave, and a DNA expert opined that Talbert's DNA matched the DNA in the blood on the door and the microwave.

In his arguments before the court at trial, Talbert acknowledged, through his trial lawyer, that he had been in the house on the night of the shooting, but he had also been shot and was an additional victim rather than the perpetrator. The record reflects that Talbert has two healed gunshot wounds on his back and one in his arm. A medical examiner opined that the wounds were at least five years old. Additionally, Talbert submitted a police report from the Toledo Police Department, which stated that a man named "Kenneth Brown" went to the St. Vincent Hospital in Toledo, Ohio to be treated for gunshot wounds on February 4, 2006. The police report noted that Brown was a black male in his twenties who was driving home from Cleveland with his cousin when he was shot at a BP gas station by a man who got into an argument with his cousin. Brown was shot in the right arm and left side of his chest. When the police arrived at the hospital to speak with him, Brown fled the hospital and could not be located. At trial,

---

Walton's case were unknown to the prosecution at the time of Talbert's trial, so they were not turned over to Talbert with the discovery materials.

Talbert's lawyer asserted that Talbert was the "Brown" in the police report, and argued that Talbert was another victim of violence inside the house rather than a perpetrator of violence.

By stipulation, Talbert also presented evidence via written statements from several individuals familiar with the St. Mary's Street house. According to the witness statements, the house was a "trick house" that was always open. One of the statements indicated that Walton, who was known as "Nardo," was talking about someone from out of town bringing some marijuana over to the house. There was also testimony that other individuals associated with the house would sell cocaine and marijuana. Another witness testified that someone named Brandon Johnson stated that if he did not get his money this time "when they come, I'm just shooting."

Following the testimony and closing argument, the trial court found that Talbert was guilty of felony murder.

## II. SUPPRESSION OF IDENTIFICATION TESTIMONY

### A. STANDARD OF REVIEW

Talbert first argues that the trial court erred by denying his motion to suppress Vaid's identification of him as one of the men who left the house immediately after the shooting. Generally, this Court will not reverse a trial court's decision to admit identification evidence unless the decision was clearly erroneous. *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *Id*. This Court reviews de novo issues of law relevant to a motion to suppress. *Id*.

### B. ANALYSIS

"A lineup can be so suggestive and conducive to irreparable misidentification that it denies an accused due process of law." *People v Hornsby*, 251 Mich App 462, 466; 650 NW2d 700 (2002). To sustain a due process challenge, the defendant must demonstrate "that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.), implied overruling on other grounds recognized in *People v Perry*, 317 Mich App 589, 589; 895 NW2d 216 (2016). Physical discrepancies among lineup participants do not automatically render a lineup procedure defective. *Hornsby*, 251 Mich App at 466. Instead, physical discrepancies are only significant when they (1) are noticeable to the witness and (2) "substantially distinguish the defendant from the other lineup participants." *Id*. Standing alone, evidence that the witness was informed that the suspect was in the lineup does not render the lineup unduly suggestive. *People v McElhaney*, 215 Mich App 269, 287; 545 NW2d 18 (1996). In the event that the trial court determines that an unduly suggestive pretrial identification procedure was used, the court should suppress any in-court identification unless an independent basis for its admission exists. *Id*. at 286.

Here, Talbert fails to point to any facts in support of his assertion that the lineup was impermissibly suggestive, and we have not discerned any evidence from the record suggesting that the lineup was impermissibly suggestive. Instead, the record reflects that Talbert was represented by a lawyer during the in-person lineup and the lawyer had an opportunity to

examine the participants before the lineup. The lawyer did not object to the individuals used in the lineup or raise any other issue with the lineup procedures. There was also testimony that Vaid was sequestered before the lineup, so she could not see any contact Talbert had with the deputies before the lineup. Consequently, the record is devoid of any indication that Vaid's identification of Talbert at the in-person lineup was the result of impermissibly suggestive procedures.

On appeal, Talbert argues that Vaid's in-court identification lacks an independent basis. However, because there is no evidence of an unduly suggestive pretrial identification procedure, the trial court was not obligated to determine whether there was an independent basis for admitting identification testimony. See *id*. at 287. Consequently, the trial court did not err by denying the motion to suppress Vaid's identification testimony.[3]

## III. *BRADY* VIOLATION

### A. STANDARD OF REVIEW

Finally, Talbert argues that the prosecution's failure to disclose evidence that Vaid previously testified in 2006 at Harold Walton's preliminary examination violated his constitutional right to discovery and entitles him to a new trial. In February and March 2006, Walton was identified by Vaid as one of the men who left the house shortly after the shooting. This Court reviews de novo constitutional due process claims, such as allegations of a *Brady*[4] violation. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

### B. ANALYSIS

Although an accused does not possess a general constitutional right to discovery, due process demands "that the prosecution disclose evidence in its possession that is exculpatory and material, regardless of whether defendant requests the evidence." *People v Jackson*, 292 Mich App 583, 590-591; 808 NW2d 541 (2011), citing *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 US at 87. To demonstrate that a violation of a defendant's due process right to the disclosure of information has occurred, the defendant must show: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

---

[3] In a related argument, Talbert argues that, in the absence of Vaid's identification testimony, there is insufficient evidence to sustain his conviction of felony murder. Yet, because the identification testimony was properly admitted, this claim lacks merit.

[4] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Relevant to this issue, at sentencing, Talbert filed a motion for mistrial based on the prosecution's failure to provide him with information regarding Walton, who was charged with Phillips's murder in 2006. Neither Walton nor Walton's 2006 court file could be located at that time. The trial court denied the motion. Thereafter, while his appeal was pending before this Court, Talbert's lawyer acquired a copy of the March 2006 preliminary-examination transcript from Walton's case.

Vaid testified at the examination, identifying Walton as one of the men who ran from the house after the shooting. However, she also testified that she could not see the men's faces "in great detail," and she stated that "the first one who came out, I didn't see." She explained that she did see the second man, who she identified as Walton. Yet, during Talbert's trial, she positively identified him as one of the men, stating that there "are just some things you never forget. And when I saw [Talbert's] face I remembered it." She also stated that there was no doubt in her mind that Talbert was one of the men who left the house after the shooting. There were additional discrepancies between Vaid's 2006 testimony and her 2016 testimony, including details on whether one of the men was carrying a long object that looked like a gun, whether Talbert was the man with a gun, whether Phillips took a bag of marijuana from the backseat, and why she and Phillips were visiting the home in the first instance. For example, in 2006 she testified she did not know why they were at the house and did not see Phillips take anything from the backseat, whereas in 2016 she testified Phillips was there to sell marijuana and took a bag of marijuana into the house with him.

Based on the 2006 preliminary-examination testimony, Talbert sought a remand to determine whether a *Brady*-violation occurred. This Court granted his motion, remanding with orders for the trial court to hold "an evidentiary hearing and [render a] decision regarding the existence and relevancy of an alleged violation under *Brady* . . . ." *People v Talbert*, unpublished order of the Court of Appeals, entered October 9, 2017 (Docket No. 336843).

On remand, Talbert filed a brief arguing that the preliminary-examination transcript was inadvertently suppressed and it was favorable to the defense as it would have significantly impeached Vaid's trial testimony and was also substantive evidence that she did not see the first man who exited the house. Talbert did not directly address the materiality of the evidence, however. In response, the prosecution conceded that the preliminary-examination transcript had been suppressed and that it was favorable to the defense. However, it argued that the suppressed evidence lacked "materiality." Specifically, the prosecution noted that although Vaid's identification testimony could be impeached, Talbert's DNA was found at the scene. Further, the prosecution noted that because of the DNA evidence linking him to the scene, Talbert's defense at trial was that he was "merely present" and was an additional shooting victim. In his reply brief, Talbert argued that the trial court had placed "significant weight" on Vaid's testimony and that, if the certainty of her identification was impeached, there would have been a reasonable doubt as to whether Talbert was guilty of felony murder. Following oral argument, the trial court found that Talbert did not establish the third element of a *Brady* violation, i.e. that the suppressed evidence was material.

On appeal, the prosecution again concedes that the evidence was suppressed and that it was favorable to the defense, but it argues that Talbert cannot establish that the evidence was material. Materiality exists when there is a reasonable probability that, had the defense known

about the suppressed evidence, the result of the proceeding would have been different. *Chenault*, 495 Mich at 150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citations omitted). The defendant is not obligated to prove that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *Id*. The relevant inquiry is "whether, in the absence of the suppressed evidence, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Id*. at 150-151, quoting *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995). When assessing materiality, this Court should "consider the suppressed evidence collectively, rather than piecemeal." *Chenault*, 495 Mich at 151.

Here, the trial court—which was also the factfinder—considered the suppressed evidence and determined that even with the evidence the verdict was still worthy of confidence. In doing so, the court noted that it did not, in fact, place "significant" weight on Vaid's identification of Talbert as one of the men who left the house. Instead, the court found that Vaid's identification testimony was only part of the evidence it relied on at trial. The court explained:

> The evidence before me in the waiver trial of Mr. Talbert was the identification by the girlfriend—or fiancée of the Deceased, Mr. Phillips. The statement of the Defendant to the police that he was never at the home on St. Mary's and his arrival at St. Vincent Hospital in Toledo where he claimed to the hospital personnel that he'd been shot on an expressway—or at a BP gas station, which he could not identify to the medical personnel treating him except that it was a BP gas station he knew not where. These things make me rule again that my verdict was worthy of confidence.

> His false exculpatory statements coupled with the identification, coupled with his fresh blood, it's practically time stamped at the time of the murder which is—in my experience on the Bench very unusual. Then the argument in court to me—the closing argument by the Defense was that he was merely present. [The prosecution] argued that he was fully a participant in the robbery/murder of Corey Phillips and with that I totally agreed.

> Therefore the motion to re-open the testimony or evidence is denied. The motion for a new trial is denied.

We see no error in the court's analysis. As the court pointed out, Vaid's identification testimony was only part of the evidence presented. DNA evidence placed Talbert at the scene. The evidence was located on the door and on the microwave. The blood on the microwave was bright red and smeared. Additionally, it is undisputed that Talbert made a false exculpatory statement to law enforcement when he unequivocally stated that it was not his blood and that he had never been to the house on St. Mary's street. Further, unlike the identification testimony, other parts of Vaid's testimony remained consistent or she voluntarily explained the reasons for the inconsistencies before the prosecution and the defense were aware of the inconsistencies. For example, she consistently testified that she went to the house with Phillips, who went into the backseat before entering the house. She consistently stated that she heard gunshots and saw two, young black men leave the house. A difference between the 2006 testimony and the 2016 testimony was that, in 2016, she admitted that Phillips was at the house to sell marijuana, that he

-6-

took a bag of marijuana from the backseat, and that the bag was missing after Phillips was murdered. She explained in 2016 that in 2006 she was embarrassed that Phillips was selling drugs and did not want to say so. Additionally, at Walton's preliminary examination, she was impeached with statements she made to the police indicating that Phillips was there to sell marijuana and that he took it into the house in a bag. Therefore, although her identification testimony could be significantly impeached at Talbert's trial, there is no significant and unaddressed challenge to the remainder of her testimony.[5]

Furthermore, at trial, Talbert's defense was that he was merely present at the house on St. Mary's *at the time of the shooting*. He presented evidence supporting his defense that he was an additional shooting victim and had to seek treatment at a hospital in Ohio for gunshots wounds sustained in the house. Talbert did not have to use that defense at trial. The record before the trial court would have supported an argument by Talbert that Vaid's identification was not worthy of belief and that, without it, there was nothing to link him to the crime scene at the time of the murder. For example, there were significant deficiencies in Vaid's ability to make an identification that could have been highlighted in support of an argument that Talbert was not, in fact, at the scene at the time of the shooting. It was dark. She had not previously seen the men who exited the house. She was watching them at an angle and from a distance. The lighting was questionable and she admitted to only seeing them for a brief period of time. She had difficulty identifying any specific features on the men, such as whether they had facial hair. Furthermore, before the in-person lineup she was provided with information including Talbert's name, which provided Vaid with an opportunity to independently search for his likeness before participating in the lineup.[6] Additionally, at trial, she testified that she believed Walton's charges were dismissed for insufficient evidence, so Talbert's lawyer could have, at that time, cross-examined her on whether she testified against Walton and whether she blamed herself for that failure and

---

[5] We do not find it relevant to a *Brady* analysis whether Talbert would have sought a jury trial and to have Vaid testify in person had he known about Vaid's prior testimony. When reviewing a *Brady* violation, we are examining whether the verdict actually rendered was worthy of confidence, not whether Talbert would have made an entirely different strategy on who to present his case to. See generally *Chenault*, 495 Mich at 150-151.

[6] On remand, the defense presented evidence that if someone used Google to search for Talbert's name, a link to Talbert's MySpace page could easily be located. The defense also asserted that the photograph of Talbert on his MySpace page was similar to his present appearance. The defense suggested that, as a result, Vaid could have found Talbert's photograph online notwithstanding her testimony that she did not search the Offender Tracking Information System (OTIS) or other internet sources for pictures of Talbert before participating in the in-person lineup. Thus, although the MySpace page is certainly additional evidence supporting the defendant's theory, it relates to an issue that was brought up and addressed at trial. Further, there is nothing on the record suggesting that the defense could not have presented the MySpace photograph at trial. Therefore, we decline to consider this when addressing the materiality of the suppressed evidence.

was determined to have stronger identification testimony at Talbert's trial.[7] Given the already weak identification testimony, additional testimony impeaching Vaid's identification of Talbert was not likely to significantly impact either the defense theory of the case or her credibility with the court. In fact, the strongest part of Vaid's identification was that there was independent evidence—i.e. the DNA at the scene—to corroborate her identification. The link between her identification and the DNA evidence remains as strong, even in light of the fact that her testimony was subject to additional impeachment based on her 2006 testimony in Walton's case.

Moreover, on remand before the trial court and in his supplemental brief on appeal, Talbert does not argue that he would have presented a different defense theory at trial had he been aware of the suppressed evidence. Instead, the affidavits submitted by Talbert and his trial lawyer only state that if they had been aware of the suppressed evidence Talbert would not have waived his right to a jury trial and would not have agreed to allow Vaid to testify via a video conference. In other words, although Talbert now claims he would have sought a different factfinder, he does not also assert that he would have argued before that factfinder that he was not present at the home at the time of the shooting and that his blood was at the house from an altercation unconnected with the murder of Phillips.

In sum, although Vaid's identification testimony could have been further impeached by the 2006 preliminary-examination transcript, there is not a reasonable probability that, had the defense known about the suppressed evidence, that the result of the proceedings would have been different. *Chenault*, 495 Mich at 150. Because Talbert cannot establish that the evidence was material, we conclude that a *Brady* violation did not occur.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Jane M. Beckering
/s/ Michael J. Kelly

---

[7] On appeal, the defense suggests that Walton's charges were dismissed because of Vaid's weak identification testimony. However, although the defense provided a copy of the motion to quash the bindover in Walton's case and a copy of the order dismissing the case, the reasons the court quashed the bindover are unclear. We decline to speculate on appeal that the reason the bindover was quashed was because of Vaid's identification testimony, especially given that Walton's argument was that the bindover was improper because the prosecution failed to establish the elements of the crime. Although Walton suggested that Vaid's identification testimony was "shaky," he acknowledged that her identification would have to be viewed in the light most favorable to the prosecution. In other words, there is no evidence on the record currently before this Court that Walton's bindover was quashed because of Vaid's "weak" identification of Walton. Additionally, there is no evidence that Vaid herself felt that her identification testimony was insufficient in Walton's trial. Accordingly, we do not find this aspect of Talbert's argument persuasive.