*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 25, 2020

Plaintiff-Appellee,

v

No. 344960
Genesee Circuit Court
LC No. 16-040303-FC

DOMINIQUE MARQUISE SINGLETON,

Defendant-Appellant.

Before: BORRELLO, P.J., and METER and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, felon in possession of a firearm MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to prison terms of 682 months to 87½ years each for the murder and felon-in-possession convictions, which were to be served concurrently with each other but consecutively to concurrent prison terms of five years each for the felony-firearm convictions. For the reasons set forth in this opinion, we affirm the trial court's evidentiary rulings but remand this matter for the trial court to properly consider defendant's speedy trial claim consistent with this opinion.

## I. BACKGROUND

Defendant's convictions arise from the shooting death of Ajayi McGuire on May 21, 2016, at the Fly City Car Wash in Flint. Zyiontae Dudley, who was McGuire's cousin, testified that he and McGuire were both working at the car wash that day when a man wearing a black "hoodie" with the hood up got out of a white car, walked to the car wash bays where Dudley and McGuire were working, and started shooting at McGuire. Dudley saw McGuire slip, get up, and run. Dudley also ran, and he did not see the shooter's face. He testified that the shooter "looked like he was a heavyset dude." Dudley saw the shooter run after McGuire, and he heard multiple gunshots. Dudley hid in the bushes and then climbed over a fence and went to a friend's house. While Dudley was in the bushes, he saw the shooter run from the area where McGuire had been. The shooter ran up a hill to the white car, which had been moved from its initial location, and got

into the passenger side of the vehicle. It was subsequently determined from an autopsy that McGuire died from multiple gunshot wounds.

Treasure Boone testified that her stepfather, James Holcolm, Jr., called her on May 21, 2016, and that he "sounded quite drunk" and "kind of nervous." According to Boone, Holcolm told her, "I done fucked up." Holcolm explained that he had "shot up a car wash" and that he had "shot someone." Holcolm also told her that she needed to take care of her mother because he was "scared that he was going to be going away for a while." Boone ended the conversation because she had to go to work, and she called her sister to tell her about the conversation with Holcolm. Boone testified that she did not initially believe that Holcolm's story was true. However, after later seeing a report on the Flint Police Operations Facebook page about a shooting at a car wash, Boone informed her employer and the police were contacted. Boone also stated that her mother owned a white Buick Regal and that Holcolm drove it occasionally when his car broke down.

Sergeant William Jennings of the Michigan State Police testified that he interviewed Holcolm after he had been arrested. Holcolm claimed that defendant committed the shooting.

Holcolm testified at defendant's trial. He acknowledged that he had originally been charged with open murder in connection to this case, but he entered into a plea agreement in which he agreed to testify against defendant and pleaded guilty to accessory after the fact and felony-firearm. Holcolm testified that he and defendant both worked for the same company and that he would occasionally give defendant a ride to work. Defendant also occasionally went to Holcolm's home for a haircut. Holcolm knew that defendant had a girlfriend who was pregnant at the time of the shooting. According to Holcolm, defendant had expressed concern that he was not the child's father. Holcolm testified that on May 18, 2016, defendant told him that someone had broken into defendant's apartment. Holcolm called defendant on May 21, and defendant subsequently arrived at Holcolm's home. Defendant asked Holcolm to take him to his grandmother's house after helping him bring his truck to his girlfriend. Holcolm agreed. Holcolm testified that defendant asked Holcolm to "stop by the car wash" on the way to his grandmother's home " 'cause he had to take care of some business.' " Holcolm agreed. He was driving his wife's white Buick Regal. Defendant was wearing red sweatpants, a black "hoodie," and black tennis shoes. Holcolm was carrying a nine-millimeter handgun for "protection" because the area was "rough," but he did not know at the time if defendant was carrying a weapon.

Holcolm testified that when they arrived at the car wash, he rolled down his window and had a conversation with one of the employees. After Holcolm finished talking to this person, defendant told Holcolm to park. According to Holcolm, defendant was staring at one of the open wash bays, and a "big" gun fell out onto defendant's lap when he unzipped his jacket. Defendant told Holcolm that he might need to move his car out of the parking lot, after which defendant "jumped out the car." Holcolm's testimony continued as follows:

> *Q*. And did you say anything about moving the car? Or rather like where to move the car I should say?

> *A*. I said why at first, then he jumped out the car and I knew why.

> *Q*. Now before—this why is that, it's—why was that?

-2-

*A*. He had the gun in his hand, something was finna happen, so I got out of the parking lot.

Holcolm parked on a side street that looked down onto the car wash parking lot. He dropped his phone on the floor and as he reached down to pick it up, he heard "a lot" of gunshots. Holcolm opened his car door, stood up, and looked down at the car wash parking lot. He saw defendant standing in the first bay shooting at an individual. Other people were running away. Holcolm testified that defendant stopped shooting, looked around, and then started shooting again. Defendant then looked around and started running up the hill toward Holcolm while someone wearing white was running behind defendant. Defendant got into Holcolm's car, and Holcolm "asked him what that was about." Defendant told him that the victim had broken into defendant's apartment. Holcolm asked defendant if he had shot the person and defendant replied that he had. Holcolm dropped defendant off at defendant's grandmother's house, purchased alcohol, went home, and "[got] drunk." Holcolm testified that he spoke to Boone at some point after arriving home. According to Holcolm, he told her that "something bad" had happened, that it "probably was going to be on the news," and that he "didn't have nothing to do with it." Holcolm testified that defendant had not ridden in the white Buick Regal before the day of the murder.

David Barnett, who was also working at the car wash that day, testified that the shooter was "about 5'7", 5'8", kind of thick." Barnett was also familiar with Holcolm, and Barnett described Holcolm as being taller and "more muscular" than the shooter. Barnett testified that Holcolm was not the shooter.

At the scene of the murder, police officers found .45 caliber shell casings. The police also searched defendant's girlfriend's apartment and found a gun case for a Taurus .45 caliber firearm in the master bedroom. Police also found a cell phone in the master bedroom. Defendant's girlfriend, Lakendra Thomas, indicated that this cell phone belonged to defendant. Defendant's identification card was found during the search of the apartment as well. Thomas testified that defendant stayed at her apartment on a regular basis and that somebody broke into her apartment on May 18, 2016. According to Thomas, defendant suggested that one of her former boyfriends broke into the apartment. McGuire was Thomas's former boyfriend. Defendant's fingerprints were also found on the front passenger side door of the white Buick Regal that belonged to Holcolm's wife.

The jury convicted defendant as previously noted.

## II. SPEEDY TRIAL

On appeal, defendant first argues that he was denied his constitutional right to a speedy trial because he was arrested in May 2016, and his trial did not begin until June 5, 2018, due to inexcusable delay and despite his attempts to exercise his right to a speedy trial.

## A. STANDARD OF REVIEW

This Court reviews de novo, as an issue of constitutional law, whether defendant was denied his right to a speedy trial. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). However, underlying factual findings by the trial court on this issue are reviewed for clear error. *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009).

## B. ANALYSIS

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a speedy trial." *Williams*, 475 Mich at 261, citing US Const, Am VI; Const 1963, art 1, § 20. Our Supreme Court has adopted the factors set forth by the United States Supreme Court in *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972), for evaluating speedy trial claims. *Williams*, 475 Mich at 261. In evaluating whether a criminal defendant's right to a speedy trial has been violated, courts must balance the following four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262; see also *Barker*, 407 US at 530.

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest," *Williams*, 475 Mich at 261, but "there is no set number of days between a defendant's arrest and trial that is determinative of a speedy trial claim," *Waclawski*, 286 Mich App at 665. "If the total delay . . . from the date of the defendant's arrest until the time that trial commences . . . is under 18 months, then the burden is on the defendant to show that he or she suffered prejudice. However, if the delay is over 18 months, prejudice is presumed and the burden is on the prosecution to rebut the presumption." *Waclawski*, 286 Mich App at 665. "Under the *Barker* test, a presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Williams*, 475 Mich at 262.

In this case, Jennings testified that defendant was taken into custody on May 22, 2016. Defendant's trial began more than two years later on June 5, 2018. Because the period of delay between defendant's arrest and his trial was more than 18 months, prejudice is presumed, *Waclawski*, 286 Mich App at 665, and consideration of the *Barker* factors is necessary, *Williams*, 475 Mich at 262. Defendant asserted his desire to exercise is right to a speedy trial, and he objected to delays and adjournments, on multiple occasions before his trial finally commenced. Most recently, defendant raised his speedy trial right at a March 22, 2018 pretrial hearing, wherein defendant's trial date was set for June 5, 2018. The trial court indicated that this was the soonest date defendant's trial could be scheduled. However, in response to defendant's motion, the trial court did not conduct an analysis of the *Barker* factors or otherwise engage in any legal analysis raised by defendant. This was error as at that point in the proceedings, more than 18 months since defendant was arrested had elapsed and defendant still was not being brought to trial. Consequently, such a lengthy delay was presumptively prejudicial and the trial court was obligated to consider the *Barker* factors to determine whether plaintiff's right to a speedy trial had been violated. *Williams*, 475 Mich at 262. And, it was the prosecution's burden to rebut the presumption of prejudice. *Waclawski*, 286 Mich App at 665.

As previously stated, the trial court failed to conduct the requisite legal inquiry under *Barker*, hence, there are no factual findings for this Court to review. Therefore, we must remand this matter to the trial court to fully consider and make findings as to whether defendant's constitutional right to a speedy trial was violated and to determine whether the prosecution met its burden of rebutting the presumption of prejudice. We therefore remand the question of whether defendant's constitutional right to a speedy trial was violated and whether defendant suffered prejudice as a result. In order to make such findings, the trial court shall make findings of fact and apply the *Barker* balancing test so as to facilitate any possible subsequent appellate review.

## III.  TELEPHONE RECORD AND TEXT MESSAGE TESTIMONY BY JENNINGS

Next, defendant claims on appeal that the trial court abused its discretion by allowing Jennings to testify that his review of the telephone records of defendant and Holcolm corroborated statements made by Holcolm concerning events surrounding the shooting.  Defendant appears to argue that this testimony constituted improper lay opinion testimony concerning defendant's guilt that was inadmissible under MRE 701.

### A.  STANDARD OF REVIEW

We review decisions regarding whether to admit or exclude evidence for an abuse of discretion.  *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).  "A trial court abuses its discretion when it chooses an outcome that falls outside the range of principled outcomes." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013).

### B.  ANALYSIS

MRE 701 states, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Additionally, under MRE 704, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  However, "[a] witness may not opine about the defendant's guilt or innocence in a criminal case."  *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012).  It is also "improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial."  *Musser*, 494 Mich at 349.  "[S]uch statements are considered 'superfluous' and are 'inadmissible lay witness [ ] opinion on the believability of a [witness's] story' because the jury is 'in just as good a position to evaluate the [witness's] testimony.' "  *Id*. (citation omitted; second, third, and fourth alterations in original).

In this case, Jennings testified that he reviewed the phone records from defendant's phone and Holcolm's phone, including the text messages to and from defendant's phone.  Jennings further testified that these records corroborated other information that had been gathered during the course of the investigation, including Holcolm's statements about when he had been in contact with defendant during the time surrounding the murder.  Contrary to defendant's argument on appeal, this testimony by itself did not constitute an opinion on Holcolm's credibility; Jennings did not opine that Holcolm was telling the truth or that Holcolm should be believed because he was a credible witness.  Jennings merely laid out the evidence gathered during the investigation.  This was not an improper lay opinion on witness credibility, nor was it a lay opinion that defendant was guilty.  Instead, the testimony demonstrated the steps that were taken in investigating the murder and why Holcolm's statements regarding defendant's involvement warranted further police investigation.  Jennings's testimony, including his opinion regarding corroboration, was rationally based on his own perceptions.  MRE 701.

Under MRE 701, a police officer may testify in the form of a lay opinion when that opinion, as was the case here, is based on the officer's personal perceptions and involves the steps of the officer's investigation.  See *Heft*, 299 Mich App at 83 & n 41 (stating that police officers'

testimony explaining the steps of their investigations from their personal perceptions was admissible under MRE 701); see also *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994) (holding that under MRE 701, the trial court did not abuse its discretion by permitting a police officer to testify to his opinion that the defendant was selling crack cocaine to occupants of vehicles based on the officer's observations of certain acts by the defendant because the opinion testimony was "based on [the officer's] perception and assisted the jurors in determining whether defendant was involved in narcotics trafficking"). Accordingly, the trial court did not abuse its discretion in permitting the testimony by Jennings that defendant now challenges on appeal.[1]

## IV. PRIOR ACT EVIDENCE

Defendant next argues that the trial court erred by admitting testimony suggesting that defendant stole a .45-caliber Taurus firearm from Dominique Paylor. There was evidence at trial indicating that McGuire was shot with a .45-caliber gun. Paylor testified at trial that two days before the murder, someone stole his .45-caliber Taurus firearm from his car. Paylor knew defendant, and he testified that he saw defendant in the area on the day that the firearm was stolen. Paylor did not report the firearm stolen because he thought he would be able to get it back. He testified, "I knew [defendant] as we grew up, so I always—I mean, I didn't figure it as a big deal of me not being able to get [it] back." Paylor identified the .45 caliber Taurus gun case that was found in defendant's girlfriend's apartment as the one in which Paylor kept his firearm. Defendant argues on appeal that the evidence of his suspected involvement in the theft of the gun was inadmissible under MRE 404(b)(1) because it was more prejudicial than probative.

## A. STANDARD OF REVIEW

As we have already stated, a trial court's evidentiary decisions are reviewed for an abuse of discretion. *Aldrich*, 246 Mich App at 113. We review preliminary questions of law, such as whether admission of the evidence is prohibited by a rule of evidence, de novo. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010).

## B. ANALYSIS

MRE 404(b)(1) provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other

---

[1] As defendant notes, the officer did make further statements that the evidence eliminated Holcolm as the shooter. However, the trial court sustained defense counsel's objection and directed the jury not to consider that statement. Defendant does not claim any error on appeal with respect to the trial court's handling of this matter.

crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), our Supreme Court held that determining the admissibility of other-acts evidence under MRE 404(b) requires a court to apply the following test:

First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.

MRE 404(b)(1) contains a nonexhaustive list of potential proper purposes. *Id*. at 66.

In this case, the prosecutor argued in the trial court that the evidence suggesting that defendant took Paylor's .45 caliber firearm was offered to show that defendant had access to the type of weapon used to shoot the victim. The prosecutor also argued that this evidence was relevant to showing defendant's intent, premeditation, and deliberation, all of which were material considering that defendant had been charged with open murder.

The purposes relied upon by the prosecutor in the trial court were proper, noncharacter purposes under MRE 404(b) that were relevant to material issues at trial. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. For there to be a "proper purpose," the "evidence must be relevant to an issue other than propensity under Rule 404(b), to protect[ ] against the introduction of extrinsic act evidence when that evidence is offered *solely* to prove character. Stated otherwise, the prosecutor must offer the other acts evidence under something other than a character to conduct theory." *VanderVliet*, 444 Mich at 74 (quotation marks and citation omitted; alteration in original).

Evidence presented at trial established that McGuire was killed by a .45 caliber firearm, therefore, evidence suggesting defendant's connection to such a weapon was highly relevant to demonstrating that defendant committed the murder. See MRE 401; *People v Hall*, 433 Mich 573, 580-581; 447 NW2d 580 (1989) (opinion by BOYLE, J.)[2] ("Evidence of a defendant's possession

_____

[2] We find the treatment of MRE 401's relevancy standard employed in Justice BOYLE's plurality opinion in *Hall* applicable today, even though it was used in the context of an approach to MRE 404(b) that was somewhat different from the test later adopted in *VanderVliet*, because MRE 401 has not changed since *Hall* was decided. Compare *Hall*, 433 Mich at 579-582, 585-588 (opinion by BOYLE, J.), with *VanderVliet*, 444 Mich at 55. In *Hall*, Justice BOYLE reasoned that evidence showing possession by the defendant of a weapon of the type shown to have been used in the crime is relevant to establishing the defendant's identity as the perpetrator of the crime because it tends to "link the defendant[] to the crime" and "make [the defendant's] participation in the [crime] more probable . . . than it would be without the evidence." *Hall*, 433 Mich at 581 (opinion by BOYLE,

of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense."). The evidence suggesting that defendant stole Paylor's .45 caliber firearm and that there had been a firearm in the case when it was stolen from Paylor's vehicle two days before the murder was even more relevant in light of the evidence that the gun's empty case was discovered in a place connected to defendant. This evidence made it more probable that defendant actually possessed the weapon at the time of the murder and weakened the ability of defendant to argue that he somehow only came into possession of an empty gun case. Hence, Paylor's testimony was relevant to showing defendant committed the murder and was offered for the proper purpose of showing defendant's access to a weapon of the type used in the murder. *VanderVliet*, 444 Mich at 74; *Hall*, 433 Mich at 580-581 (opinion by BOYLE, J.).

Furthermore, this evidence was also relevant to the proper purpose of showing defendant's intent and premeditation. Because of the difficulty in proving state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill. *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). The prosecutor's theory at trial was that defendant shot McGuire because he believed that McGuire (who was defendant's girlfriend's former boyfriend) was involved in the earlier break-in at defendant's home. The evidence that defendant took the firearm from his friend's car on May 19, 2016, one day after his home had been broken into and two days before the murder, supported an inference that defendant was planning an act of revenge for the break-in. Thus, the evidence was also offered for the proper, noncharacter purpose of showing defendant's intent and premeditation, which were relevant to the murder charge.

Thus, Paylor's testimony satisfies the first two prongs of the *VanderVliet* test.

The third *VanderVliet* prong requires a consideration under MRE 403 whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *VanderVliet*, 444 Mich at 74-75. Defendant's appellate argument focuses primarily on this prong. Defendant maintains that it was unfairly prejudicial to permit evidence that would lead the jury to conclude that defendant was "a thief who would even steal from a friend." However, this is not the type of *unfair* prejudice proscribed by MRE 403.

All relevant evidence is inherently prejudicial. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). To be subject to exclusion under MRE 403, there must be a probability "that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect" such that "it would be inequitable to allow the proponent of the evidence to use it." *Id*. at 75-76 (quotation marks and citation omitted). Evidence is unfairly prejudicial when it causes the jury to consider issues extraneous to the merits of the case, such as "bias, sympathy, anger, or shock." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citations omitted).

As previously stated, the evidence suggesting that defendant took Paylor's .45 caliber firearm was highly probative that defendant was in possession of the type of weapon used in the

_____

J.) (quotation marks and citations omitted; ellipsis in original). We conclude that this reasoning is persuasive to our resolution of the prior-acts issue in the instant case.

murder, as well as his intent to plan and commit the murder. That he took this weapon from "a friend" was a fact of minimal significance when considered in light of the total sum of the evidence introduced at trial and the seriousness of the crime primarily at issue—the murder of McGuire— such that it was not unfair to permit the prosecution to introduce Paylor's testimony. *Mills*, 450 Mich at 75-76. Any incidental negative reflection on defendant's character as a friend was not so inflammatory that it was likely to arouse the jury's bias, sympathy, anger, or shock. *Cameron*, 291 Mich App at 611. There was also no risk that the jury would weigh this tangential reflection on defendant's treatment of "a friend" out of proportion to its logically damaging effect. *Mills*, 450 Mich at 75. Notably, the evidence was significantly damaging to defendant for the reasons explained above related to its probative value. Thus, there was no danger that the high probative value of Paylor's testimony would be "substantially outweighed by the danger of unfair prejudice." MRE 403.

Additionally, the trial court provided a specific limiting instruction concerning the proper use of this evidence. *VanderVliet*, 444 Mich at 55. This limiting instruction advised the jury on the limited permissible use of this evidence and mitigated any potential for unfair prejudice. Based on this record, we conclude that defendant is not entitled to relief on this issue because defendant is unable to show that admission of Paylor's testimony constituted an abuse of discretion.

## V. AUTHENTICATION OF TEXT MESSAGES

Next, defendant argues that the trial court erred when it permitted the prosecutor to introduce text messages found on defendant's phone because the messages were not properly authenticated. Defendant argues that proper authentication was lacking because no one corroborated that the messages were actually authored by defendant. We review this issue for an abuse of discretion. *People v Ford*, 262 Mich App 443, 460; 687 NW2d 119 (2004).

MRE 901(a) provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

"It is axiomatic that proposed evidence need not tell the whole story of a case, nor need it be free of weakness or doubt. It need only meet the minimum requirements for admissibility." *People v McDade*, 301 Mich App 343, 353; 836 NW2d 266 (2013) (quotation marks and citation omitted). Regarding the authorship of letters, a sufficient foundation to authenticate the evidence under MRE 901 may be established by evidence tending to show that the message originated with defendant, see *id*. at 353, or evidence showing identification of authorship based on the message's "contents and distinctive characteristics." *Ford*, 262 Mich App at 461-462 (quotation marks omitted). Additionally, MRE 901(b) provides a nonexhaustive list of authentication examples, including in pertinent part as follows:

> (4) *Distinctive Characteristics and the Like*. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

* * *

(6) *Telephone Conversations.* Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

In this case, testimony was presented that the phone was found at the home of defendant's girlfriend while defendant was present, and the phone was in the same room as defendant's identification. Moreover, Thomas identified the phone as defendant's phone. This testimony linked defendant to the home where the cell phone was found and further supported a finding that the phone was in fact defendant's phone. With respect to the messages themselves, testimony was presented that some of the incoming messages were addressed to defendant by name and that an outgoing message identified the sender from the phone associated with defendant as "Bam," which other testimony indicated was a nickname associated with defendant. This information, coupled with evidence identifying the phone as defendant's phone, provided sufficient support for a finding that defendant was the author and sender of the outgoing text messages on the phone. Accordingly, the trial court did not abuse its discretion by ruling that the text messages were properly authenticated under MRE 901.

While we affirm the trial court's evidentiary rulings that have been challenged by defendant on appeal, we remand this matter for the trial court to properly address defendant's speedy trial claim.

Remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Patrick M. Meter
/s/ Michael J. Riordan